(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## OKLAHOMA *v.* CASTRO-HUERTA

### CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF OKLAHOMA

No. 21–429. Argued April 27, 2022—Decided June 29, 2022

In 2015, respondent Victor Manuel Castro-Huerta was charged by the State of Oklahoma for child neglect. Castro-Huerta was convicted in state court and sentenced to 35 years of imprisonment. While Castro-Huerta's state-court appeal was pending, this Court decided *McGirt* v. *Oklahoma*, 591 U. S. ___. There, the Court held that the Creek Nation's reservation in eastern Oklahoma had never been properly disestablished and therefore remained "Indian country." *Id.,* at ___. In light of *McGirt*, the eastern part of Oklahoma, including Tulsa, is recognized as Indian country. Following this development, Castro-Huerta argued that the Federal Government had exclusive jurisdiction to prosecute him (a non-Indian) for a crime committed against his step-daughter (a Cherokee Indian) in Tulsa (Indian country), and that the State therefore lacked jurisdiction to prosecute him. The Oklahoma Court of Criminal Appeals agreed and vacated his conviction. This Court granted certiorari to determine the extent of a State's jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country.

*Held*: The Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country. Pp. 4–25.

   (a) The jurisdictional dispute in this case arises because Oklahoma's territory includes Indian country. In the early Republic, the Federal Government sometimes treated Indian country as separate from state territory. See *Worcester* v. *Georgia,* 6 Pet. 515. But that view has long since been abandoned. *Organized Village of Kake* v. *Egan,* 369 U. S. 60, 72. And the Court has specifically held that States have jurisdiction to prosecute crimes committed by non-Indians against non-Indians in Indian country. *United States* v. *McBratney,* 104 U. S. 621; see

also *Draper* v. *United States,* 164 U. S. 240, 244–247.  Accordingly, States have jurisdiction to prosecute crimes committed in Indian country unless preempted.  Pp. 4–6.

(b) Under Court precedent, a State's jurisdiction in Indian country may be preempted by federal law under ordinary principles of federal preemption, or when the exercise of state jurisdiction would unlawfully infringe on tribal self-government.  Neither serves to preempt state jurisdiction in this case.  Pp. 6–20.

(1) Castro-Huerta points to two federal laws—the General Crimes Act and Public Law 280—that, in his view, preempt Oklahoma's authority to prosecute crimes committed by non-Indians against Indians in Indian country.  Neither statute, however, preempts the State's jurisdiction.  Pp. 7–18.

(i) The General Crimes Act does not preempt state authority to prosecute Castro-Huerta's crime.  It provides that "the general laws of the United States as to the punishment of offenses committed . . . within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country."  18 U. S. C. §1152.  By its terms, the Act simply "extend[s]" the federal laws that apply on federal enclaves to Indian country.  The Act does not say that Indian country is equivalent to a federal enclave for jurisdictional purposes, that federal jurisdiction is exclusive in Indian country, or that state jurisdiction is preempted in Indian country.

Castro-Huerta claims that the General Crimes Act does indeed make Indian country the jurisdictional equivalent of a federal enclave. Castro-Huerta is wrong as a matter of text and precedent.

Pointing to the history of territorial separation and Congress's reenactment of the General Crimes Act after this Court suggested in dicta in *Williams* v. *United States,* 327 U. S. 711, 714, that States lack jurisdiction over crimes committed by non-Indians against Indians in Indian country, Castro-Huerta argues that Congress *implicitly intended* for the Act to provide the Federal Government with exclusive jurisdiction over crimes committed by non-Indians against Indians in Indian country.  But the text of the Act says no such thing; the idea of territorial separation has long since been abandoned; and the reenactment canon cannot be invoked to override clear statutory language of the kind present in the General Crimes Act.  Castro-Huerta notes that the Court has repeated the *Williams* dicta on subsequent occasions, but even repeated dicta does not constitute precedent and does not alter the plain text of the General Crimes Act.  Pp. 7–16.

(ii) Castro-Huerta's attempt to invoke Public Law 280, 67 Stat. 588, is also unpersuasive.  That law affirmatively grants certain States (and allows other States to acquire) broad jurisdiction to prosecute state-law offenses committed by or against Indians in Indian country.

18 U. S. C. §1162; 25 U. S. C. §1321. Castro-Huerta contends that the law's enactment in 1953 would have been pointless surplusage if States already had concurrent jurisdiction over crimes committed by non-Indians against Indians in Indian country. But Public Law 280 contains no language preempting state jurisdiction. And Public Law 280 encompasses far more than just non-Indian on Indian crimes. Thus, resolution of the narrow jurisdictional issue here does not negate the significance of Public Law 280. Pp. 16–18.

  (2) The test articulated in *White Mountain Apache Tribe* v. *Bracker,* 448 U. S. 136, does not bar the State from prosecuting crimes committed by non-Indians against Indians in Indian country. There, the Court held that even when federal law does not preempt state jurisdiction under ordinary preemption analysis, preemption may still occur if the exercise of state jurisdiction would unlawfully infringe upon tribal self-government. *Id.,* at 142–143. Under *Bracker*'s balancing test, the Court considers tribal interests, federal interests, and state interests. *Id.,* at 145. Here, the exercise of state jurisdiction would not infringe on tribal self-government. And because a State's jurisdiction is concurrent with federal jurisdiction, a state prosecution would not preclude an earlier or later federal prosecution. Finally, the State has a strong sovereign interest in ensuring public safety and criminal justice within its territory, including an interest in protecting both Indian and non-Indian crime victims. Pp. 18–20.

  (c) This Court has long held that Indian country is part of a State, not separate from it. Under the Constitution, States have jurisdiction to prosecute crimes within their territory except when preempted by federal law or by principles of tribal self-government. The default is that States have criminal jurisdiction in Indian country unless that jurisdiction is preempted. And that jurisdiction has not been preempted here. Pp. 21–25.

Reversed and remanded.

  KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and BARRETT, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 21–429

## OKLAHOMA, PETITIONER *v.* VICTOR MANUEL CASTRO-HUERTA

### ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF OKLAHOMA

[June 29, 2022]

JUSTICE KAVANAUGH delivered the opinion of the Court.

This case presents a jurisdictional question about the prosecution of crimes committed by non-Indians against Indians in Indian country: Under current federal law, does the Federal Government have *exclusive* jurisdiction to prosecute those crimes? Or do the Federal Government and the State have *concurrent* jurisdiction to prosecute those crimes? We conclude that the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country.

I

In 2015, Victor Manuel Castro-Huerta lived in Tulsa, Oklahoma, with his wife and their several children, including Castro-Huerta's then-5-year-old stepdaughter, who is a Cherokee Indian. The stepdaughter has cerebral palsy and is legally blind. One day in 2015, Castro-Huerta's sister-in-law was in the house and noticed that the young girl was sick. After a 911 call, the girl was rushed to a Tulsa hospital in critical condition. Dehydrated, emaciated, and covered in lice and excrement, she weighed only 19 pounds. Investigators later found her bed filled with bedbugs and

cockroaches.

When questioned, Castro-Huerta admitted that he had severely undernourished his stepdaughter during the preceding month. The State of Oklahoma criminally charged both Castro-Huerta and his wife for child neglect. Both were convicted. Castro-Huerta was sentenced to 35 years of imprisonment, with the possibility of parole. This case concerns the State's prosecution of Castro-Huerta.

After Castro-Huerta was convicted and while his appeal was pending in state court, this Court decided *McGirt* v. *Oklahoma*, 591 U. S. ___ (2020). In *McGirt*, the Court held that Congress had never properly disestablished the Creek Nation's reservation in eastern Oklahoma. As a result, the Court concluded that the Creek Reservation remained "Indian country." *Id.,* at ___–___, ___, ___ (slip op., at 1–3, 17, 28). The status of that part of Oklahoma as Indian country meant that different jurisdictional rules might apply for the prosecution of criminal offenses in that area. See 18 U. S. C. §§1151–1153. Based on *McGirt*'s reasoning, the Oklahoma Court of Criminal Appeals later recognized that several other Indian reservations in Oklahoma had likewise never been properly disestablished. See, *e.g.*, *State ex rel. Matloff* v. *Wallace*, 2021 OK CR 21, ¶15, 497 P. 3d 686, 689 (reaffirming recognition of the Cherokee, Choctaw, and Chickasaw Reservations); *Grayson* v. *State*, 2021 OK CR 8, ¶10, 485 P. 3d 250, 254 (Seminole Reservation).

In light of *McGirt* and the follow-on cases, the eastern part of Oklahoma, including Tulsa, is now recognized as Indian country. About two million people live there, and the vast majority are not Indians.

The classification of eastern Oklahoma as Indian country has raised urgent questions about which government or governments have jurisdiction to prosecute crimes committed there. This case is an example: a crime committed in what is now recognized as Indian country (Tulsa) by a non-

Indian (Castro-Huerta) against an Indian (his stepdaughter). All agree that the Federal Government has jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country. The question is whether the Federal Government's jurisdiction is exclusive, or whether the State also has concurrent jurisdiction with the Federal Government.

In the wake of *McGirt*, Castro-Huerta argued that the Federal Government's jurisdiction to prosecute crimes committed by a non-Indian against an Indian in Indian country is exclusive and that the State therefore lacked jurisdiction to prosecute him. The Oklahoma Court of Criminal Appeals agreed with Castro-Huerta. Relying on an earlier Oklahoma decision holding that the federal General Crimes Act grants the Federal Government exclusive jurisdiction, the court ruled that the State did not have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country. The court therefore vacated Castro-Huerta's conviction. No. F–2017–1203 (Apr. 29, 2021); see also *Bosse* v. *State*, 2021 OK CR 3, 484 P. 3d 286; *Roth* v. *State*, 2021 OK CR 27, 499 P. 3d 23.

While Castro-Huerta's state appellate proceedings were ongoing, a federal grand jury in Oklahoma indicted Castro-Huerta for the same conduct. Castro-Huerta accepted a plea agreement for a 7-year sentence followed by removal from the United States. (Castro-Huerta is not a U. S. citizen and is unlawfully in the United States.) In other words, putting aside parole possibilities, Castro-Huerta in effect received a 28-year reduction of his sentence as a result of *McGirt*.

Castro-Huerta's case exemplifies a now-familiar pattern in Oklahoma in the wake of *McGirt*. The Oklahoma courts have reversed numerous state convictions on that same jurisdictional ground. After having their state convictions reversed, some non-Indian criminals have received lighter

sentences in plea deals negotiated with the Federal Government. Others have simply gone free. Going forward, the State estimates that it will have to transfer prosecutorial responsibility for more than 18,000 cases per year to the Federal and Tribal Governments. All of this has created a significant challenge for the Federal Government and for the people of Oklahoma. At the end of fiscal year 2021, the U. S. Department of Justice was opening only 22% and 31% of all felony referrals in the Eastern and Northern Districts of Oklahoma. Dept. of Justice, U. S. Attorneys, Fiscal Year 2023 Congressional Justification 46. And the Department recently acknowledged that "many people may not be held accountable for their criminal conduct due to resource constraints." *Ibid.*

In light of the sudden significance of this jurisdictional question for public safety and the criminal justice system in Oklahoma, this Court granted certiorari to decide whether a State has concurrent jurisdiction with the Federal Government to prosecute crimes committed by non-Indians against Indians in Indian country. 595 U. S. ___ (2022).[1]

## II

The jurisdictional dispute in this case arises because Oklahoma's territory includes Indian country. Federal law defines "Indian country" to include, among other things, "all land within the limits of any Indian reservation under the jurisdiction of the United States Government." 18 U. S. C. §1151.

To begin with, the Constitution allows a State to exercise jurisdiction in Indian country. Indian country is part of the State, not separate from the State. To be sure, under this Court's precedents, federal law may preempt that state jurisdiction in certain circumstances. But otherwise, as a

_____

[1] Both the United States and the Cherokee Nation, along with several other Tribes, filed *amicus* briefs in this case articulating their views on the legal questions before the Court.

matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country. See U. S. Const., Amdt. 10. As this Court has phrased it, a State is generally "entitled to the sovereignty and jurisdiction over all the territory within her limits." *Lessee of Pollard* v. *Hagan*, 3 How. 212, 228 (1845).

In the early years of the Republic, the Federal Government sometimes treated Indian country as separate from state territory—in the same way that, for example, New Jersey is separate from New York. Most prominently, in the 1832 decision in *Worcester* v. *Georgia*, 6 Pet. 515, 561, this Court held that Georgia state law had no force in the Cherokee Nation because the Cherokee Nation "is a distinct community occupying its own territory."

But the "general notion drawn from Chief Justice Marshall's opinion in *Worcester* v. *Georgia*" "has yielded to closer analysis." *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 72 (1962). "By 1880 the Court no longer viewed reservations as distinct nations." *Ibid.* Since the latter half of the 1800s, the Court has consistently and explicitly held that Indian reservations are "part of the surrounding State" and subject to the State's jurisdiction "except as forbidden by federal law." *Ibid.*

To take a few examples: In 1859, the Court stated: States retain "the power of a sovereign over their persons and property, so far as" "necessary to preserve the peace of the Commonwealth." *New York ex rel. Cutler* v. *Dibble*, 21 How. 366, 370 (1859).

In 1930: "[R]eservations are part of the State within which they lie and her laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to the Indian wards." *Surplus Trading Co.* v. *Cook*, 281 U. S. 647, 651 (1930).

In 1946: "[I]n the absence of a limiting treaty obligation

or Congressional enactment each state ha[s] a right to exercise jurisdiction over Indian reservations within its boundaries." *New York ex rel. Ray* v. *Martin*, 326 U. S. 496, 499 (1946).

In 1992: "This Court's more recent cases have recognized the rights of States, absent a congressional prohibition, to exercise criminal (and, implicitly, civil) jurisdiction over non-Indians located on reservation lands." *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 257–258 (1992).

And as recently as 2001: "State sovereignty does not end at a reservation's border." *Nevada* v. *Hicks*, 533 U. S. 353, 361 (2001).

In accord with that overarching jurisdictional principle dating back to the 1800s, States have jurisdiction to prosecute crimes committed in Indian country unless preempted. In the leading case in the criminal context—the *McBratney* case from 1882—this Court held that States have jurisdiction to prosecute crimes committed by non-Indians against non-Indians in Indian country. *United States* v. *McBratney*, 104 U. S. 621, 623–624 (1882). The Court stated that Colorado had "criminal jurisdiction" over crimes by non-Indians against non-Indians "throughout the whole of the territory within its limits, including the Ute Reservation." *Id.,* at 624. Several years later, the Court similarly decided that Montana had criminal jurisdiction over crimes by non-Indians against non-Indians in Indian country within that State. *Draper* v. *United States*, 164 U. S. 240, 244–247 (1896). The *McBratney* principle remains good law.

In short, the Court's precedents establish that Indian country is part of a State's territory and that, unless preempted, States have jurisdiction over crimes committed in Indian country.

## III

The central question that we must decide, therefore, is

whether the State's authority to prosecute crimes committed by non-Indians against Indians in Indian country has been preempted. U. S. Const., Art. VI.

Under the Court's precedents, as we will explain, a State's jurisdiction in Indian country may be preempted (i) by federal law under ordinary principles of federal preemption, or (ii) when the exercise of state jurisdiction would unlawfully infringe on tribal self-government.

In Part III–A, we consider whether state authority to prosecute crimes committed by non-Indians against Indians in Indian country is preempted by federal law under ordinary principles of preemption. In Part III–B, we consider whether principles of tribal self-government preclude the exercise of state jurisdiction over crimes committed by non-Indians against Indians in Indian country.

## A

Castro-Huerta points to two federal laws that, in his view, preempt Oklahoma's authority to prosecute crimes committed by non-Indians against Indians in Indian country: (i) the General Crimes Act, which grants the Federal Government jurisdiction to prosecute crimes in Indian country, 18 U. S. C. §1152; and (ii) Public Law 280, which grants States, or authorizes States to acquire, certain additional jurisdiction over crimes committed in Indian country, 67 Stat. 588; see 18 U. S. C. §1162; 25 U. S. C. §1321. Neither statute preempts preexisting or otherwise lawfully assumed state authority to prosecute crimes committed by non-Indians against Indians in Indian country.

## 1

As relevant here, the General Crimes Act provides: "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive juris-

diction of the United States, except the District of Columbia, shall extend to the Indian country." 18 U. S. C. §1152.

By its terms, the Act does not preempt the State's authority to prosecute non-Indians who commit crimes against Indians in Indian country. The text of the Act simply "extend[s]" federal law to Indian country, leaving untouched the background principle of state jurisdiction over crimes committed within the State, including in Indian country. *Ibid.*

The Act also specifies the body of federal criminal law that extends to Indian country—namely, "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States." *Ibid.* Those cross-referenced "general laws" are the federal laws that apply in federal enclaves such as military bases and national parks. *Ibid.*

Importantly, however, the General Crimes Act does not say that Indian country is equivalent to a federal enclave for jurisdictional purposes. Nor does the Act say that federal jurisdiction is exclusive in Indian country, or that state jurisdiction is preempted in Indian country.

Under the General Crimes Act, therefore, both the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed in Indian country.[2] The General Crimes Act does not preempt state authority to prosecute Castro-Huerta's crime.

To overcome the text, Castro-Huerta offers several counterarguments. None is persuasive.

_____

[2] To the extent that a State lacks prosecutorial authority over crimes committed by Indians in Indian country (a question not before us), that would not be a result of the General Crimes Act. Instead, it would be the result of a separate principle of federal law that, as discussed below, precludes state interference with tribal self-government. See Part III–B, *infra*; *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142–143, 145 (1980); *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 171−172 (1973).

*First*, Castro-Huerta advances what he describes as a textual argument. He contends that the text of the General Crimes Act makes Indian country the jurisdictional equivalent of a federal enclave. To begin, he points out that the Federal Government has exclusive jurisdiction to prosecute crimes committed in federal enclaves such as military bases and national parks. And then Castro-Huerta asserts that the General Crimes Act in effect equates federal enclaves and Indian country. Therefore, according to Castro-Huerta, it follows that the Federal Government also has exclusive jurisdiction to prosecute crimes committed in Indian country.

Castro-Huerta's syllogism is wrong as a textual matter. The Act simply borrows the body of federal criminal law that applies in federal enclaves and extends it to Indian country. The Act does not purport to equate Indian country and federal enclaves for jurisdictional purposes. Moreover, it is not enough to speculate, as Castro-Huerta does, that Congress might have implicitly intended a jurisdictional parallel between Indian country and federal enclaves.

Castro-Huerta's argument also directly contradicts this Court's precedents. As far back as 1891, the Court stated that the phrase "sole and exclusive jurisdiction" in the General Crimes Act is "only used in the description of the laws which are extended" to Indian country, not "to the jurisdiction extended over the Indian country." *In re Wilson*, 140 U. S. 575, 578 (1891). The Court repeated that analysis in 1913, concluding that the phrase "sole and exclusive jurisdiction" is "used in order to describe the laws of the United States which by that section are extended to the Indian country." *Donnelly* v. *United States*, 228 U. S. 243, 268 (1913).

Stated otherwise, the General Crimes Act provides that the federal criminal laws that apply to federal enclaves also apply in Indian country. But the extension of those federal laws to Indian country does not silently erase preexisting

or otherwise lawfully assumed state jurisdiction to prosecute crimes committed by non-Indians in Indian country.

Moreover, if Castro-Huerta's interpretation of the General Crimes Act were correct, then the Act would preclude States from prosecuting *any* crimes in Indian country—presumably even those crimes committed by non-Indians against non-Indians—just as States ordinarily cannot prosecute crimes committed in federal enclaves. But this Court has long held that States may prosecute crimes committed by non-Indians against non-Indians in Indian country. See *McBratney*, 104 U. S., at 623–624; *Draper*, 164 U. S., at 242–246. Those holdings, too, contravene Castro-Huerta's argument regarding the General Crimes Act.

In advancing his enclave argument, Castro-Huerta also tries to analogize the text of the General Crimes Act to the text of the Major Crimes Act. He asserts that the Major Crimes Act grants the Federal Government exclusive jurisdiction to prosecute certain major crimes committed by Indians in Indian country. But the Major Crimes Act contains substantially different language than the General Crimes Act. Unlike the General Crimes Act, the Major Crimes Act says that defendants in Indian country "shall be subject to the same law" as defendants in federal enclaves. See 18 U. S. C. §1153 ("Any Indian who commits against the person or property of another Indian or other person any of" certain major offenses "shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States"). So even assuming that the text of the Major Crimes Act provides for exclusive federal jurisdiction over major crimes committed by Indians in Indian country, see, *e.g.*, *United States* v. *John*, 437 U. S. 634, 651, and n. 22 (1978); *Negonsott* v. *Samuels*, 507 U. S. 99, 103 (1993), that conclusion does not translate to the differently worded General Crimes Act.

In short, the General Crimes Act does not treat Indian

country as the equivalent of a federal enclave for jurisdictional purposes. Nor does the Act make federal jurisdiction exclusive or preempt state law in Indian country.

*Second*, Castro-Huerta contends that, regardless of the statutory text, Congress *implicitly intended* for the General Crimes Act to provide the Federal Government with exclusive jurisdiction over crimes committed by non-Indians against Indians in Indian country.

The fundamental problem with Castro-Huerta's implicit intent argument is that the text of the General Crimes Act says no such thing. Congress expresses its intentions through statutory text passed by both Houses and signed by the President (or passed over a Presidential veto). As this Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text. The Court may not "replace the actual text with speculation as to Congress' intent." *Magwood* v. *Patterson*, 561 U. S. 320, 334 (2010). Rather, the Court "will presume more modestly" that "the legislature says what it means and means what it says." *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, \_\_\_ (2017) (slip op., at 10) (internal quotation marks and alterations omitted); see, *e.g., McGirt*, 591 U. S., at \_\_\_ (slip op., at 12) ("[W]ishes are not laws"); *Virginia Uranium, Inc.* v. *Warren*, 587 U. S. \_\_\_, \_\_\_ (2019) (lead opinion) (slip op., at 14) (The Supremacy Clause cannot "be deployed" "to elevate abstract and unenacted legislative desires above state law"); *Alexander* v. *Sandoval*, 532 U. S. 275, 287–288 (2001) (The Court does not give "dispositive weight to the expectations that the enacting Congress had formed in light of the contemporary legal context," because we "begin (and find that we can end) our search for Congress's intent with . . . text and structure" (internal quotation marks omitted)); *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 173 (1994) ("[T]he text of the statute controls our decision").

To buttress his implicit intent argument, Castro-Huerta seizes on the history of the General Crimes Act. At the time of the Act's earliest iterations in 1817 and 1834, Indian country was separate from the States. Therefore, at that time, state law did not apply in Indian country—in the same way that New York law would not ordinarily have applied in New Jersey. But territorial separation—*not* jurisdictional preemption by the General Crimes Act—was the reason that state authority did not extend to Indian country at that time.

Because Congress operated under a different territorial paradigm in 1817 and 1834, it had no reason at that time to consider whether to preempt preexisting or lawfully assumed state criminal authority in Indian country. For present purposes, the fundamental point is that the text of the General Crimes Act does not preempt state law. And this Court does not "rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that . . . it never faced." *Henson*, 582 U. S., at ___ (slip op., at 9). The history of territorial separation during the early years of the Republic is not a license or excuse to rewrite the text of the General Crimes Act.

As noted above, the *Worcester*-era understanding of Indian country as separate from the State was abandoned later in the 1800s. After that change, Indian country in each State became part of that State's territory. But Congress did not alter the General Crimes Act to make federal criminal jurisdiction exclusive in Indian country. To this day, the text of the General Crimes Act still does not make federal jurisdiction exclusive or preempt state jurisdiction.

In 1882, in *McBratney*, moreover, this Court held that States have jurisdiction to prosecute at least some crimes committed in Indian country. Since 1882, therefore, Congress has been specifically aware that state criminal laws apply to some extent in Indian country. Yet since then,

Congress has never enacted new legislation that would render federal jurisdiction exclusive or preempt state jurisdiction over crimes committed by non-Indians in Indian country. Additionally, in 1979, the Office of Legal Counsel stated that this Court had not resolved the specific issue of state jurisdiction over crimes committed by non-Indians against Indians in Indian country, and that the issue was not settled. 3 Op. OLC 111, 117–119 (1979). Yet Congress still did not act to make federal jurisdiction exclusive or to preempt state jurisdiction.

On a different tack, Castro-Huerta invokes the reenactment canon. Castro-Huerta points out that, in 1948, Congress recodified the General Crimes Act. Two years before that recodification, this Court suggested in dicta that States lack jurisdiction over crimes committed by non-Indians against Indians in Indian country. See *Williams* v. *United States*, 327 U. S. 711, 714 (1946). Castro-Huerta contends that the 1948 Congress therefore intended to ratify the *Williams* dicta.

Castro-Huerta's reenactment-canon argument is misplaced. First of all, the reenactment canon does not override clear statutory language of the kind present in the General Crimes Act. See *BP p.l.c.* v. *Mayor and City Council of Baltimore*, 593 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 11). In addition, the canon does not apply to dicta. See *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 349, 351, n. 12 (2005). The Court's statements in *Williams* were pure dicta. Indeed, the *Williams* dicta did not even purport to interpret the text of the General Crimes Act. Dicta that does not analyze the relevant statutory provision cannot be said to have resolved the statute's meaning. Moreover, any inference from Congress's 1948 recodification is especially weak because that recodification was not specific to the General Crimes Act, but instead was simply a general recodification of all federal criminal laws. This Court has pre-

viously explained that "the function" of the 1948 recodification "was generally limited to that of consolidation and codification." *Muniz* v. *Hoffman*, 422 U. S. 454, 474 (1975) (internal quotation marks omitted). This Court does not infer that Congress, "in revising and consolidating the laws, intended to change their policy, unless such an intention be clearly expressed." *Id.,* at 470 (internal quotation marks omitted).

For many reasons, then, we cannot conclude that Congress, by recodifying the entire Federal Criminal Code in 1948, silently ratified a few sentences of dicta from *Williams*. The reenactment canon does not apply in this case.

*Third*, Castro-Huerta contends that the Court has repeated the 1946 *Williams* dicta on several subsequent occasions. But the Court's dicta, even if repeated, does not constitute precedent and does not alter the plain text of the General Crimes Act, which was the law passed by Congress and signed by the President. See *National Collegiate Athletic Assn.* v. *Alston*, 594 U. S. ___, ___ (2021) (slip op., at 21).[3]

_____

[3] In addition to citing *Williams* and later cases, Castro-Huerta also cites the earlier 1913 decision in *Donnelly* v. *United States*, 228 U. S. 243. According to Castro-Huerta, *Donnelly* determined that States may not exercise jurisdiction in Indian country over crimes by or against Indians. Castro-Huerta is wrong. In *Donnelly*, the Court simply concluded that although States have exclusive jurisdiction over crimes committed by non-Indians against non-Indians in Indian country, States do not have similarly "*undivided* authority" over crimes committed by or against Indians in Indian country. *Id.,* at 271–272 (emphasis added). In other words, the Federal Government also maintains jurisdiction under the General Crimes Act over crimes by or against Indians in Indian country because of the Federal Government's interest in protecting and defending tribes. See *ibid.* (citing *United States* v. *Kagama*, 118 U. S. 375 (1886)). *Donnelly* did not address the distinct question we confront here: whether States have concurrent jurisdiction with the Federal Government over non-Indians who commit crimes against Indians in Indian country. If anything, *Donnelly*'s rejection of the argument that the State had "undivided" authority, without the Court's saying more, suggests

Moreover, there is a good explanation for why the Court's previous comments on this issue came only in the form of tangential dicta. The question of whether States have concurrent jurisdiction over crimes committed by non-Indians against Indians in Indian country did not previously matter all that much and did not warrant this Court's review. Through congressional grants of authority in Public Law 280 or state-specific statutes, some States with substantial Indian populations have long possessed broad jurisdiction to prosecute a vast array of crimes in Indian country (including crimes *by Indians*). See Brief for National Congress of American Indians as *Amicus Curiae* 20, and n. 2. Indeed, Castro-Huerta notes that "21 States have jurisdiction over crimes 'by or against' Indians in some Indian country." Brief for Respondent 7. So the General Crimes Act question—namely, whether that Act preempts inherent state prosecutorial authority in Indian country—was not relevant in those States.

In any event, this Court never considered the General Crimes Act preemption question. As the Office of Legal Counsel put it, "many courts, without carefully considering the question, have assumed that Federal jurisdictio[n] whenever it obtains is exclusive. We nevertheless believe that it is a matter that should not be regarded as settled before it has been fully explored by the courts." 3 Op. OLC, at 117. This case is the first time that the matter has been fully explored by this Court.

Until the Court's decision in *McGirt* two years ago, this

———————

that the Court thought that the State had concurrent authority with the Federal Government in Indian country, unless otherwise preempted.

The Court's subsequent decision in *United States* v. *Ramsey*, 271 U. S. 467 (1926), likewise considered whether the Federal Government's "authority" to prosecute crimes committed by or against Indians "was ended by the grant of statehood." *Id.,* at 469. The Court held that federal authority was not "ended" by statehood. *Ibid.* But the Court did not say that States lacked concurrent jurisdiction.

question likewise did not matter much in Oklahoma. Most everyone in Oklahoma previously understood that the State included almost no Indian country. *McGirt*, 590 U. S., at ___–___ (ROBERTS, C. J., dissenting) (slip op., at 31–32). But after *McGirt*, about 43% of Oklahoma—including Tulsa—is now considered Indian country. Therefore, the question of whether the State of Oklahoma retains concurrent jurisdiction to prosecute non-Indian on Indian crimes in Indian country has suddenly assumed immense importance. The jurisdictional question has now been called. In light of the newfound significance of the question, it is necessary and appropriate for this Court to take its first hard look at the text and structure of the General Crimes Act, rather than relying on scattered dicta about a question that, until now, was relatively insignificant in the real world.

After independently examining the question, we have concluded that the General Crimes Act does not preempt state jurisdiction over crimes committed by non-Indians against Indians in Indian country.

2

Castro-Huerta next invokes Public Law 280 as a source of preemption. That argument is similarly unpersuasive.

Public Law 280 affirmatively grants certain States broad jurisdiction to prosecute state-law offenses committed by or against Indians in Indian country. See 18 U. S. C. §1162. (Other States may opt in, with tribal consent. 25 U. S. C. §1321.) But Public Law 280 does not preempt any preexisting or otherwise lawfully assumed jurisdiction that States possess to prosecute crimes in Indian country. Indeed, the Court has already concluded as much: "Nothing in the language or legislative history of Pub. L. 280 indicates that it was meant to divest States of pre-existing and otherwise lawfully assumed jurisdiction." *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467

U. S. 138, 150 (1984). The Court's definitive statement in *Three Affiliated Tribes* about Public Law 280 applies to both civil and criminal jurisdiction. And the Court's statement follows ineluctably from the statutory text: Public Law 280 contains no language that preempts States' civil or criminal jurisdiction.

Castro-Huerta separately contends that the enactment of Public Law 280 in 1953 would have been pointless surplusage if States already had concurrent jurisdiction over crimes committed by non-Indians against Indians in Indian country. So he says that, as of 1953, Congress must have assumed that States did not already have concurrent jurisdiction over those crimes. To begin with, assumptions are not laws, and the fact remains that Public Law 280 contains no language preempting state jurisdiction, as the Court already held in *Three Affiliated Tribes*. Apart from that, Public Law 280 encompasses far more than just non-Indian on Indian crimes (the issue here). Public Law 280 also grants States jurisdiction over crimes committed *by Indians*. See Conference of Western Attorneys General, American Indian Law Deskbook §4.6, p. 250–251 (2021 ed.); cf. *Negonsott*, 507 U. S., at 105–107. Absent Public Law 280, state jurisdiction over those Indian-defendant crimes could implicate principles of tribal self-government. See *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142–143 (1980); Part III–B, *infra*. So our resolution of the narrow jurisdictional issue in this case does not negate the significance of Public Law 280 in affording States broad criminal jurisdiction over other crimes committed in Indian country, such as crimes committed by Indians.[4]

_____

[4] Castro-Huerta also points to several state-specific grants of jurisdiction from 1940 through 1948. See Act of July 2, 1948, ch. 809, 62 Stat. 1224 (New York); Act of June 30, 1948, ch. 759, 62 Stat. 1161 (Iowa); Act of May 31, 1946, ch. 279, 60 Stat. 229 (North Dakota); Act of June 8, 1940, ch. 276, 54 Stat. 249 (Kansas). Those statutes operate similarly to Public Law 280.

In any event, to the extent that there is any overlap (or even complete overlap) between Public Law 280's jurisdictional grant and some of the States' preexisting jurisdiction with respect to crimes committed in Indian country, it made good sense for Congress in 1953 to explicitly grant such authority in Public Law 280.  The scope of the States' authority had not previously been resolved by this Court, except in cases such as *McBratney* and *Draper* with respect to non-Indian on non-Indian crimes.  Congressional action in the face of such legal uncertainty cannot reasonably be characterized as unnecessary surplusage.  See *Nielsen* v. *Preap*, 586 U. S. ___, ___–___ (2019) (slip op., at 20–21).  And finally, even if there is some surplusage, the Court has stated that "[r]edundancy is not a silver bullet" when interpreting statutes.  *Rimini Street, Inc*. v. *Oracle USA, Inc.*, 586 U. S. ___, ___ (2019) (slip op., at 11).

In sum, Public Law 280 does not preempt state authority to prosecute crimes committed by non-Indians against Indians in Indian country.

### B

Applying what has been referred to as the *Bracker* balancing test, this Court has recognized that even when federal law does not preempt state jurisdiction under ordinary preemption analysis, preemption may still occur if the exercise of state jurisdiction would unlawfully infringe upon tribal self-government.  See *Bracker*, 448 U. S., at 142–143; see also *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 333–335 (1983).  Under the *Bracker* balancing test, the Court considers tribal interests, federal interests, and state interests.  448 U. S., at 145.[5]

———————

[5] The dissent suggests that we should not reach *Bracker* because Congress has already spoken to the issue and preempted state jurisdiction. *Post*, at 30−32 (opinion of GORSUCH, J.).  As already discussed, Congress did not preempt the State's jurisdiction over crimes committed by non-Indians against Indians in Indian country.  Therefore, we proceed to

Opinion of the Court

Here, *Bracker* does not bar the State from prosecuting crimes committed by non-Indians against Indians in Indian country.

*First*, the exercise of state jurisdiction here would not infringe on tribal self-government. In particular, a state prosecution of a crime committed by a non-Indian against an Indian would not deprive the tribe of any of its prosecutorial authority. That is because, with exceptions not invoked here, Indian tribes lack criminal jurisdiction to prosecute crimes committed by non-Indians such as Castro-Huerta, even when non-Indians commit crimes against Indians in Indian country. See *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191, 195 (1978).

Moreover, a state prosecution of a non-Indian does not involve the exercise of state power over any Indian or over any tribe. The only parties to the criminal case are the State and the non-Indian defendant. Therefore, as has been recognized, any tribal self-government "justification for preemption of state jurisdiction" would be "problematic." American Indian Law Deskbook §4.8, at 260; see *Three Affiliated Tribes*, 467 U. S., at 148; see also *Hicks*, 533 U. S., at 364; *McBratney*, 104 U. S., at 623–624; *Draper*, 164 U. S., at 242–243.[6]

*Second*, a state prosecution of a non-Indian likewise would not harm the federal interest in protecting Indian victims. State prosecution would supplement federal authority, not supplant federal authority. As the United

———————

*Bracker* balancing to determine whether the exercise of state jurisdiction would unlawfully infringe on tribal self-government.

[6] To the extent that some tribes might have a policy preference for federal jurisdiction or tribal jurisdiction, but not state jurisdiction, over crimes committed by non-Indians in Indian country, that policy preference does not factor into the *Bracker* analysis.

Furthermore, this case does not involve the converse situation of a State's prosecution of crimes committed by an Indian against a non-Indian in Indian country. We express no view on state jurisdiction over a criminal case of that kind.

States has explained in the past, "recognition of concurrent state jurisdiction" could "facilitate effective law enforcement on the Reservation, and thereby further the federal and tribal interests in protecting Indians and their property against the actions of non-Indians." Brief for United States as *Amicus Curiae* in *Arizona* v. *Flint*, O. T. 1988, No. 603, p. 6. The situation might be different if state jurisdiction ousted federal jurisdiction. But because the State's jurisdiction would be concurrent with federal jurisdiction, a state prosecution would not preclude an earlier or later federal prosecution and would not harm the federal interest in protecting Indian victims.

*Third*, the State has a strong sovereign interest in ensuring public safety and criminal justice within its territory, and in protecting all crime victims. See *Dibble*, 21 How., at 370. The State also has a strong interest in ensuring that criminal offenders—especially violent offenders—are appropriately punished and do not harm others in the State.

The State's interest in protecting crime victims includes both Indian and non-Indian victims. If his victim were a non-Indian, Castro-Huerta could be prosecuted by the State, as he acknowledges. But because his victim is an Indian, Castro-Huerta says that he is free from state prosecution. Castro-Huerta's argument would require this Court to treat Indian victims as second-class citizens. We decline to do so.[7]

———————

[7] Castro-Huerta notes that many tribes were enemies of States in the 1700s and 1800s. The theory appears to be that States (unlike the Federal Government) cannot be trusted to fairly and aggressively prosecute crimes committed by non-Indians against Indians in 2022. That theory is misplaced for at least two reasons. *First*, the State's jurisdiction would simply be concurrent with, not exclusive of, the Federal Government's. If concurrent state jurisdiction somehow poses a problem, Congress can seek to alter it. *Second*, many tribes were also opposed to the *Federal Government* at least as late as the Civil War. Indeed, some of those tribes, including the Cherokees, held black slaves and entered into treaties with the Confederate government. A. Gibson, Native Americans and

Opinion of the Court

## IV

The dissent emphasizes the history of mistreatment of American Indians. But that history does not resolve the legal questions presented in this case. Those questions are: (i) whether Indian country is part of a State or instead is separate and independent from a State; and (ii) if Indian country is part of a State, whether the State has concurrent jurisdiction with the Federal Government to prosecute crimes committed by non-Indians against Indians in Indian country.

The answers to those questions are straightforward. On the first question, as explained above, this Court has repeatedly ruled that Indian country is part of a State, not separate from a State. By contrast, the dissent lifts up the 1832 decision in *Worcester* v. *Georgia* as a proper exposition of Indian law. But this Court long ago made clear that *Worcester* rested on a mistaken understanding of the relationship between Indian country and the States. The Court has stated that the "general notion drawn from Chief Justice Marshall's opinion in *Worcester* v. *Georgia*" "has yielded to closer analysis": "By 1880 the Court no longer viewed reservations as distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law." *Organized Village of Kake*, 369 U. S., at 72.

Because Indian country is part of a State, not separate

---

the Civil War, 9 Am. Indian Q. 4, 385, 388 (1985); 1 F. Cohen, Handbook of Federal Indian Law §4.07(1)(a), p. 289 (2012); see *McGirt* v. *Oklahoma*, 591 U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (ROBERTS, C. J., dissenting) (slip op., at 3–4); *Cherokee Nation* v. *Nash*, 267 F. Supp. 3d 86, 89–90 (DC 2017). In any event, it is not evident why the pre-Civil War history of tribal discord with States—unconnected from any statutory text—should disable States from exercising jurisdiction in 2022 to ensure that crime victims in state territory are protected under the State's laws.

from a State, the second question here—the question regarding the State's jurisdiction to prosecute Castro-Huerta—is also straightforward. Under the Constitution, States have jurisdiction to prosecute crimes within their territory except when preempted (in a manner consistent with the Constitution) by federal law or by principles of tribal self-government. As we have explained, no federal law preempts the State's exercise of jurisdiction over crimes committed by non-Indians against Indians in Indian country. And principles of tribal self-government likewise do not preempt state jurisdiction here.

As a corollary to its argument that Indian country is inherently separate from States, the dissent contends that Congress must affirmatively authorize States to exercise jurisdiction in Indian country, even jurisdiction to prosecute crimes committed by non-Indians. But under the Constitution and this Court's precedents, the default is that States may exercise criminal jurisdiction within their territory. See Amdt. 10. States do not need a permission slip from Congress to exercise their sovereign authority. In other words, the default is that States have criminal jurisdiction in Indian country unless that jurisdiction is *preempted*. In the dissent's view, by contrast, the default is that States do *not* have criminal jurisdiction in Indian country unless Congress specifically *provides* it. The dissent's view is inconsistent with the Constitution's structure, the States' inherent sovereignty, and the Court's precedents.

Straying further afield, the dissent seizes on treaties from the 1800s. *Post*, at 18−20, and n. 4 (opinion of GORSUCH, J.).[8] But those treaties do not preclude state jurisdiction here. The dissent relies heavily on the 1835 Treaty of New Echota, which stated that Indian country

_____

[8] Congress "abolished treatymaking with the Indian nations in 1871 and has itself subjected the tribes to substantial bodies of state and federal law." *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 257 (1992) (citation omitted).

was separate from States, and which the dissent says was preserved in relevant part by the 1866 Treaty. See Treaty with the Cherokee (New Echota), Art. 5, Dec. 29, 1835, 7 Stat. 481; Treaty with the Cherokee, July 19, 1866, 14 Stat. 709. But history and legal development did not end in 1866. Some early treaties may have been consistent with the *Worcester*-era theory of separateness. But as relevant here, those treaties have been supplanted: Specific to Oklahoma, those treaties, in relevant part, were formally supplanted no later than the 1906 Act enabling Oklahoma's statehood. See Oklahoma Enabling Act, ch. 3335, 34 Stat. 267. As this Court has previously concluded, "admission of a State into the Union" "necessarily repeals the provisions of any prior statute, or of any existing treaty" that is inconsistent with the State's exercise of criminal jurisdiction "throughout the whole of the territory within its limits," including Indian country, unless the enabling act says otherwise "by express words." *McBratney*, 104 U. S., at 623−624; see *Draper*, 164 U. S., at 242–246. The Oklahoma Enabling Act contains no such express exception. Therefore, at least since Oklahoma's statehood in the early 1900s, Indian country has been part of the territory of Oklahoma.

The dissent responds that the language of the 1906 statute enabling Oklahoma's statehood itself established a jurisdictional division between the State and Indian country. See *post*, at 20–22 (discussing the Oklahoma Enabling Act). That argument is mistaken. This Court long ago explained that interpreting a statehood act to divest a State of jurisdiction over Indian country "wholly situated within [its] geographical boundaries" would undermine "the very nature of the equality conferred on the State by virtue of its admission into the Union." *Draper*, 164 U. S., at 242–243. So the Court requires clear statutory language "to create an exception" to that "rule." *Id.,* at 244. To reiterate, the Oklahoma Enabling Act contains no such clear language. Indeed, the Court has interpreted similar statutory language in other

state enabling acts not to displace state jurisdiction. See *id.,* at 243–247; *Organized Village of Kake*, 369 U. S., at 67–71. In *Organized Village of Kake*, the Court specifically addressed several state enabling acts, including the Oklahoma Enabling Act, and stated that statutory language reserving jurisdiction and control to the United States was meant to preserve federal jurisdiction to the extent that it existed before statehood, not to make federal jurisdiction exclusive. *Id.,* at 67–70. Consistent with that precedent, today's decision recognizes that the Federal Government and the State have concurrent jurisdiction over crimes committed by non-Indians against Indians in Indian country.[9]

The dissent incorrectly seeks to characterize various aspects of the Court's decision as dicta. To be clear, the Court today holds that Indian country within a State's territory is part of a State, not separate from a State. Therefore, a State has jurisdiction to prosecute crimes committed in Indian country unless state jurisdiction is preempted. With respect to crimes committed by non-Indians against Indians in Indian country, the Court today further holds that the General Crimes Act does not preempt the State's authority to prosecute; that Public Law 280 does not preempt

_____

[9] The dissent characterizes the Court's opinion in several ways that are not accurate. *Post*, at 38−41. For example, the dissent suggests that States may not exercise jurisdiction over crimes committed by Indians against non-Indians in Indian country—the reverse of the scenario in this case. To reiterate, we do not take a position on that question. See *supra,* at 19, n. 6.

The dissent also hints that the jurisdictional holding of the Court in this case may apply only in Oklahoma. That is incorrect. The Court's holding is an interpretation of federal law, which applies throughout the United States: Unless preempted, States may exercise jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country.

Finally, the statutory definition of Indian country includes "all Indian allotments, the Indian titles to which have not been extinguished." See 18 U. S. C. §1151. Therefore, States may prosecute crimes committed by non-Indians against Indians in those allotments.

the State's authority to prosecute; that no principle of tribal self-government preempts the State's authority to prosecute; that the cited treaties do not preempt Oklahoma's authority to prosecute; and that the Oklahoma Enabling Act does not preempt Oklahoma's authority to prosecute (indeed, it solidifies the State's presumptive sovereign authority to prosecute). Comments in the dissenting opinion suggesting anything otherwise "are just that: comments in a dissenting opinion." *Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 177, n. 10 (1980).

From start to finish, the dissent employs extraordinary rhetoric in articulating its deeply held policy views about what Indian law should be. The dissent goes so far as to draft a proposed statute for Congress. But this Court's proper role under Article III of the Constitution is to declare what the law is, not what we think the law should be. The dissent's views about the jurisdictional question presented in this case are contrary to this Court's precedents and to the laws enacted by Congress.

\*    \*    \*

We conclude that the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country. We therefore reverse the judgment of the Oklahoma Court of Criminal Appeals and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 21–429

———

## OKLAHOMA, PETITIONER *v.* VICTOR MANUEL CASTRO-HUERTA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF OKLAHOMA

[June 29, 2022]

JUSTICE GORSUCH, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

In 1831, Georgia arrested Samuel Worcester, a white missionary, for preaching to the Cherokee on tribal lands without a license. Really, the prosecution was a show of force—an attempt by the State to demonstrate its authority over tribal lands. Speaking for this Court, Chief Justice Marshall refused to endorse Georgia's ploy because the State enjoyed no lawful right to govern the territory of a separate sovereign. See *Worcester* v. *Georgia*, 6 Pet. 515, 561 (1832). The Court's decision was deeply unpopular, and both Georgia and President Jackson flouted it. But in time, *Worcester* came to be recognized as one of this Court's finer hours. The decision established a foundational rule that would persist for over 200 years: Native American Tribes retain their sovereignty unless and until Congress ordains otherwise. *Worcester* proved that, even in the "[c]ourts of the conqueror," the rule of law meant something. *Johnson's Lessee* v. *McIntosh*, 8 Wheat. 543, 588 (1823).

Where this Court once stood firm, today it wilts. After the Cherokee's exile to what became Oklahoma, the federal government promised the Tribe that it would remain forever free from interference by state authorities. Only the Tribe or the federal government could punish crimes by or against tribal members on tribal lands. At various points

in its history, Oklahoma has chafed at this limitation. Now, the State seeks to claim for itself the power to try crimes by non-Indians against tribal members within the Cherokee Reservation. Where our predecessors refused to participate in one State's unlawful power grab at the expense of the Cherokee, today's Court accedes to another's. Respectfully, I dissent.

## I

### A

Long before our Republic, the Cherokee controlled much of what is now Georgia, North Carolina, South Carolina, and Tennessee. See 1 G. Litton, History of Oklahoma at the Golden Anniversary of Statehood 91 (1957) (Litton). The Cherokee were a "distinct, independent political community[y]," who "retain[ed] their original" sovereign right to "regulat[e] their internal and social relations." *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 55 (1978) (internal quotation marks omitted).

As colonists settled coastal areas near Cherokee territory, the Tribe proved a valuable trading partner—and a military threat. See W. Echo-Hawk, In the Court of the Conqueror 89 (2010). Recognizing this, Great Britain signed a treaty with the Cherokee in 1730. See 1 Litton 92. As was true of "tributary" and "feudatory states" in Europe, the Cherokee did not cease to be "sovereign and independent" under this arrangement, but retained the right to govern their internal affairs. E. de Vattel, Law of Nations 60–61 (1805); see *Worcester*, 6 Pet., at 561. Meanwhile, under British law the crown possessed "centraliz[ed]" authority over diplomacy with Tribes to the exclusion of colonial governments. See C. Berkey, United States–Indian Relations: The Constitutional Basis, in Exiled in the Land of the Free 192 (H. Lyons ed. 1992).

Ultimately, the American Revolution replaced that legal framework with a similar one. When the delegates drafted

the Articles of Confederation, they debated whether the national or state authorities should manage Indian affairs. See 6 Journals of the Continental Congress, 1774–1789, pp. 1077–1079 (W. Ford ed. 1906). The resulting compromise proved unworkable. The Articles granted Congress the "sole and exclusive right and power of . . . regulating the trade and managing all affairs with the Indians." Art. IX. But the Articles undermined that assignment by further providing that "the legislative right of any state[,] within its own limits," could not be "infringed or violated." *Ibid.* Together, these provisions led to battles between national and state governments over who could oversee relations with various Tribes. See G. Ablavsky, Beyond the Indian Commerce Clause, 124 Yale L. J. 1012, 1033–1035 (2015) (Ablavsky). James Madison later complained that the Articles' division of authority over Indian affairs had "endeavored to accomplish [an] impossibilit[y]; to reconcile a partial sovereignty in the Union, with complete sovereignty in the States." The Federalist No. 42, p. 269 (C. Rossiter ed. 1961).

When the framers convened to draft a new Constitution, this problem was among those they sought to resolve. To that end, they gave the federal government "broad general powers" over Indian affairs. *United States* v. *Lara*, 541 U. S. 193, 200 (2004). The Constitution afforded Congress authority to make war and negotiate treaties with the Tribes. See Art. I, § 8; Art. VI, cl. 2. It barred States from doing either of these things. See Art. I, § 10. And the Constitution granted Congress the power to "regulate Commerce . . . with the Indian Tribes." Art. I, § 8, cl. 3. Nor did the Constitution replicate the Articles' carveout for state power over Tribes within their borders. Madison praised this change, contending that the new federal government would be "very properly unfettered" from this prior "limitatio[n]." The Federalist No. 42, at 268. Antifederalist Abraham Yates agreed (but bemoaned) that the Constitution "totally surrender[ed] into the hands of Congress the

management and regulation of the Indian affairs." Letter
to the Citizens of the State of New York (June 13–14, 1788),
in 20 Documentary History of the Ratification of the Con-
stitution 1153, 1158 (J. Kaminski et al. eds. 2004).

Consistent with that view, "the Washington Administra-
tion insisted that the federal government enjoyed exclusive
constitutional authority" over tribal relations. Ablavsky
1019. The new Administration understood, too, that Tribes
remained otherwise free to govern their internal affairs
without state interference. See *id.*, at 1041–1042, 1065–
1067. In a letter to the Governor of Pennsylvania, Presi-
dent Washington stated curtly that "the United States . . .
posses[es] the only authority of regulating an intercourse
with [the Indians], and redressing their grievances." Letter
to T. Mifflin (Sept. 4, 1790), in 6 Papers of George Washing-
ton: Presidential Series 396 (D. Twohig ed. 1996). Even
Thomas Jefferson, the great defender of the States' powers,
agreed that "under the present Constitution" no "State
[has] a right to Treat with the Indians without the consent
of the General Government." Letter to H. Knox (Aug. 10,
1791), in 22 Papers of Thomas Jefferson 27 (C. Cullen, E.
Sheridan, & R Lester eds. 1986).

Nor was this view confined to the Executive Branch. Con-
gress quickly exercised its new constitutional authority. In
1790, it enacted the first Indian Trade and Intercourse Act,
which pervasively regulated commercial and social ex-
changes among Indians and non-Indians. Ch. 33, 1 Stat.
137. Congress also provided for federal jurisdiction over
crimes by non-Indians against Indians on tribal lands.
§§ 5–6, *id.*, at 138. States, too, recognized their lack of au-
thority. See Ablavsky 1019, 1043. In 1789, South Carolina
Governor Charles Pinckney acknowledged to Washington
that "the sole management of India[n] affairs is now com-
mitted" to "the general Government." Letter to G. Wash-
ington (Dec. 14), in 4 Papers of George Washington: Presi-
dential Series 401, 404 (D. Twohig ed. 1993). Initially, even

Georgia took the same view. See Letter from Georgia House of Representatives to Governor Edward Telfair (June 10, 1790), in 3 Documentary History of the Ratification of the Constitution: Delaware, New Jersey, Georgia, and Connecticut 178 (M. Jensen ed. 1978) (Microform Supp. Doc. No. 50).

It was against this background that Chief Justice Marshall faced *Worcester*. After gold was discovered in Cherokee territory in the 1820s, Georgia's Legislature enacted laws designed to "seize [the] whole Cherokee country, parcel it out among the neighboring counties of the state . . . abolish [the Tribe's] institutions and its laws, and annihilate its political existence." *Worcester*, 6 Pet., at 542. Like Oklahoma today, Georgia also purported to extend its criminal laws to Cherokee lands. See *ibid.*; see also S. Breyer, The Cherokee Indians and the Supreme Court, 87 The Georgia Historical Q. 408, 416–418 (2003) (Breyer). In refusing to sanction Georgia's power grab, this Court explained that the State's "assertion of jurisdiction over the Cherokee nation" was "void," because under our Constitution only the federal government possessed the power to manage relations with the Tribe. *Worcester*, 6 Pet., at 542, 561–562.

### B

Two years later, and exercising its authority to regulate tribal affairs in the shadow of *Worcester*, Congress adopted the General Crimes Act of 1834 (GCA). That law extended federal criminal jurisdiction to tribal lands for certain crimes and, in doing so, served two apparent purposes. First, as a "courtesy" to the Tribes, the law represented a promise by the federal government "to punish crimes . . . committed . . . by and against our own [non-Indian] citizens." H. Rep. No. 474, 23d Cong., 1st Sess., 13 (1834) (H. Rep. No. 474). That jurisdictional arrangement was also

consistent with, and even seemingly compelled by, the federal government's treaties with various Tribes. See F. Cohen, Handbook of Federal Indian Law 731 (N. Newton et al. eds. 2005) (Cohen); R. Clinton, Development of Criminal Jurisdiction Over Indian Lands: The Historical Perspective, 17 Ariz. L. Rev. 951, 958–962 (1975) (Clinton). Second, because *Worcester* held that States lacked criminal jurisdiction on tribal lands, Congress sought to ensure a federal forum for crimes committed by and against non-Indians. See H. Rep. No. 474, at 13. Otherwise, Congress understood, non-Indian settlers would be subject to tribal jurisdiction alone. See *id.*, at 13, 18; R. Barsh & J. Henderson, The Betrayal, *Oliphant* v. *Suquamish Indian Tribe* and the Hunting of the Snark, 63 Minn. L. Rev. 609, 625–626 (1979). Congress reenacted the GCA in 1948 with minor amendments, but it remains in force today more or less in its original form. See 18 U. S. C. § 1152 (1946 ed., Supp. II).

Shortly after it adopted the GCA, the Senate ratified the Treaty of New Echota with the Cherokee in 1836. After the Tribe's removal from Georgia, the United States promised the Cherokee that they would enjoy a new home in the West where they could "establish . . . a government of their choice." Treaty with the Cherokee, Preamble, Dec. 29, 1835, 7 Stat. 478. Acknowledging the Tribe's past "difficulties . . . under the jurisdiction and laws of the State Governments," the treaty also pledged that the Tribe would remain forever free from "State sovereignties." *Ibid.*; see Art. 5, *id.*, at 481. These promises constituted an "indemnity," guaranteed by "*the faith of the nation,*" that "[t]he United States and the Indian tribes [would be] the sole parties" with power on new western reservations like the Cherokee's. H. Rep. No. 474, at 18 (emphasis in original).

Over time, Congress revised some of these arrangements. In 1885, dissatisfied with how the Sioux Tribe responded to the murder of a tribal member, Congress adopted the Major

Crimes Act (MCA). See R. Anderson, S. Krakoff, & B. Berger, American Indian Law: Cases and Commentary 90–96 (4th ed. 2008) (Anderson). There, Congress directed that, moving forward, only the federal government, not the Tribes, could prosecute certain serious offenses by tribal members on tribal lands. See 18 U. S. C. § 1153(a). On its own initiative, this Court then went a step further. Relying on language in certain laws admitting specific States to the Union, the Court held that States were now entitled to prosecute crimes by non-Indians against non-Indians on tribal lands. See *United States* v. *McBratney*, 104 U. S. 621, 623 (1882); *Draper* v. *United States*, 164 U. S. 240, 243, 247 (1896). Through all these developments, however, at least one promise remained: States could play no role in the prosecution of crimes by or against Native Americans on tribal lands. See *Williams* v. *Lee*, 358 U. S. 217, 220 (1959).

In 1906, Congress reaffirmed this promise to the Cherokee in Oklahoma. As a condition of its admission to the Union, Congress required Oklahoma to "declare that [it] forever disclaim[s] all right and title in or to . . . all lands lying within [the State's] limits owned or held by any Indian, tribe, or nation." 34 Stat. 270. Instead, Congress provided that tribal lands would "remain subject to the jurisdiction, disposal, and control of the United States." *Ibid.* As if the point wasn't clear enough, Congress further provided that "nothing contained in the [new Oklahoma state] constitution shall be construed to . . . limit or affect the authority of the Government of the United States . . . respecting [the State's] Indians . . . which it would have been competent to make if this Act had never been passed." *Id.*, at 267–268. The following year, Oklahoma adopted a State Constitution consistent with Congress's instructions. Art. I, § 3; see also Clinton 961.

In the years that followed, certain States sought arrangements different from Oklahoma's. And once more, Congress intervened. In 1940, Kansas asked for and received

permission from Congress to exercise jurisdiction over
crimes "by or against Indians" on tribal lands. 18 U. S. C.
§ 3243. Through the rest of the decade, Congress experi-
mented with similar laws for New York, Iowa, and North
Dakota.[1] Then, in 1953, Congress adopted Public Law 280.
That statute granted five additional States criminal "juris-
diction over offenses . . . by or against Indians" and estab-
lished procedures by which further States could secure the
same authority. See ch. 505, § 2, 67 Stat. 588. Ultimately,
however, some of these arrangements proved unpopular.
Not only with affected Tribes. See C. Goldberg-Ambrose,
Public Law 280 and the Problem of Lawlessness in Califor-
nia Indian Country, 44 UCLA L. Rev. 1405, 1406–1407
(1997) (Goldberg-Ambrose). These arrangements also
proved unpopular with certain States that viewed their new
law enforcement responsibilities on tribal lands as un-
funded federal mandates. See Anderson 436. A few States
even renounced their Public Law 280 jurisdiction. See Co-
hen 579.

By 1968, the federal government came to conclude that,
"as a matter of justice and as a matter of enlightened social
policy," the "time ha[d] come to break decisively with the
past and to create the conditions for a new era in which the
Indian future is determined by Indian acts and Indian de-
cisions." Richard M. Nixon, Special Message on Indian Af-
fairs (July 8, 1970). Consistent with that vision, Congress
amended Public Law 280 to require tribal consent before
any State could assume jurisdiction over crimes by or
against Indians on tribal lands. Act of Apr. 11, 1968, § 401,
82 Stat. 78, § 406, *id.*, at 80 (25 U. S. C. §§ 1321(a), 1326).
Recognizing that certain States' enabling acts barred state

---

[1] See Act of July 2, 1948, ch. 809, 62 Stat. 1224 (25 U. S. C. § 232) (New
York); Act of June 30, 1948, ch. 759, 62 Stat. 1161 (Iowa), repealed, Act
of Dec. 11, 2018, Pub. L. 115–301, 132 Stat. 4395; Act of May 31, 1946,
ch. 279, 60 Stat. 229 (North Dakota).

authority on tribal lands and required States to adopt constitutional provisions guaranteeing as much, Congress also authorized States to "amend, where necessary, their State constitution or . . . statutes." § 404, 82 Stat. 79 (25 U. S. C. § 1324). In doing so, however, Congress emphasized that affected States could not assume jurisdiction to prosecute offenses by or against tribal members on tribal lands until they "appropriately amended their State constitution or statutes." *Ibid.* To date, Oklahoma has not amended its state constitutional provisions disclaiming jurisdiction over tribal lands. Nor has Oklahoma sought or obtained tribal consent to the exercise of its jurisdiction. See *The Honorable E. Kelly Haney*, 22 Okla. Op. Atty. Gen. No. 90–32, 72, 1991 WL 567868, \*1 (Mar. 1, 1991) (*Haney*). Thus, Oklahoma has remained, in Congress's words, a State "not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within" its borders. 25 U. S. C. § 1321(a).

## C

Rather than seek tribal consent pursuant to Public Law 280 or persuade Congress to adopt a state-specific statute authorizing it to prosecute crimes by or against tribal members on tribal lands, Oklahoma has chosen a different path. In the decades following statehood, many settlers engaged in schemes to seize Indian lands and mineral rights by subterfuge. See A. Debo, And Still the Waters Run 92–125 (1940) (Debo). These schemes resulted in "the bulk of the landed wealth of the Indians" ending up in the hands of the new settlers. See *ibid.*; see also *id.*, at 181–202. State officials and courts were sometimes complicit in the process. See *id.*, at 182–183, 185, 195–196. For years, too, Oklahoma courts asserted the power to hear criminal cases involving Native Americans on lands allotted to and owned by tribal members despite the contrary commands of the Oklahoma Enabling Act and the State's own constitution.

The State only disavowed that practice in 1991, after defeats in state and federal court. See *Haney*, 1991 WL 567868, \*1–\*3; see also *State* v. *Klindt*, 782 P. 2d 401, 404 (Okla. Crim. App. 1989); *Ross* v. *Neff*, 905 F. 2d 1349, 1353 (CA10 1990).

Still, it seems old habits die slowly. Even after renouncing the power to try criminal cases involving Native Americans on *allotted* tribal lands, Oklahoma continued to claim the power to prosecute crimes by or against Native Americans within tribal *reservations*. The State did so on the theory that at some (unspecified) point in the past, Congress had disestablished those reservations. In *McGirt* v. *Oklahoma*, this Court rejected that argument in a case involving the Muscogee (Creek) Tribe. 591 U. S. ___, ___ (2020) (slip op., at 1). We explained that Congress had never disestablished the Creek Reservation. Nor were we willing to usurp Congress's authority and disestablish that reservation by a lawless act of judicial fiat. See *id.*, at ___ (slip op., at 42). Accordingly, only federal and tribal authorities were lawfully entitled to try crimes by or against Native Americans within the Tribe's reservation. *Ibid.* Following *McGirt*, Oklahoma's courts recognized that what held true for the Creek also held true for the Cherokee: Congress had never disestablished its reservation and, accordingly, the State lacked authority to try offenses by or against tribal members within the Cherokee Reservation. See *Spears* v. *State*, 2021 OK CR 7, ¶¶ 10–14, 485 P. 3d 873, 876–877.

Once more, Oklahoma could have responded to this development by asking Congress for state-specific legislation authorizing it to exercise criminal jurisdiction on tribal lands, as Kansas and various other States have done. The State could have employed the procedures of Public Law 280 to amend its own laws and obtain tribal consent. Instead, Oklahoma responded with a media and litigation campaign seeking to portray reservations within its State—where federal and tribal authorities may prosecute crimes

by and against tribal members and Oklahoma can pursue cases involving only non-Indians—as lawless dystopias. See Brief for Cherokee Nation et al. as *Amici Curiae* 18 (Cherokee Brief) ("The State's tale of a criminal dystopia in eastern Oklahoma is just that: A tale").

That effort culminated in this case. In it, Oklahoma has pursued alternative lines of argument. First, the State has asked this Court to revisit *McGirt* and unilaterally eliminate all reservations in Oklahoma. Second, the State has argued that it enjoys a previously unrecognized "inherent" authority to try crimes within reservation boundaries by non-Indians against tribal members—a claim Oklahoma's own courts have rejected. See *Bosse* v. *State*, 2021 OK CR 3, 484 P. 3d 286, 294–295.

Ultimately, this Court declined to entertain the State's first argument but agreed to review the second. Nominally, the question comes to us in a case involving Victor Castro-Huerta, a non-Indian who abused his Cherokee stepdaughter within the Tribe's reservation. Initially, a state court convicted him for a state crime. After *McGirt*, the Oklahoma Court of Criminal Appeals determined that his conviction was invalid because only federal and tribal officials possess authority to prosecute crimes by or against Native Americans on the Cherokee Reservation. See App. to Pet. for Cert. 4a. The federal government swiftly reindicted Mr. Castro-Huerta, and a federal court again found him guilty. Now before us, Oklahoma seeks to undo Mr. Castro-Huerta's federal conviction and have him transferred from federal prison to a state facility to resume his state sentence.

Really, though, this case has less to do with where Mr. Castro-Huerta serves his time and much more to do with Oklahoma's effort to gain a legal foothold for its wish to exercise jurisdiction over crimes involving tribal members on tribal lands. To succeed, Oklahoma must disavow adverse rulings from its own courts; disregard its 1991 recognition

that it lacks legal authority to try cases of this sort; and ignore fundamental principles of tribal sovereignty, a treaty, the Oklahoma Enabling Act, its own state constitution, and Public Law 280.  Oklahoma must pursue a proposition so novel and so unlikely that in over two centuries not a single State has successfully attempted it in this Court.  Incredibly, too, the defense of tribal interests against the State's gambit falls to a non-Indian criminal defendant.  The real party in interest here isn't Mr. Castro-Huerta but the Cherokee, a Tribe of 400,000 members with its own government.  Yet the Cherokee have no voice as parties in these proceedings; they and other Tribes are relegated to the filing of *amicus* briefs.

## II
### A

Today the Court rules for Oklahoma.  In doing so, the Court announces that, when it comes to crimes by non-Indians against tribal members within tribal reservations, Oklahoma may "exercise jurisdiction."  *Ante*, at 4.  But this declaration comes as if by oracle, without any sense of the history recounted above and unattached to any colorable legal authority.  Truly, a more ahistorical and mistaken statement of Indian law would be hard to fathom.

The source of the Court's error is foundational.  Through most of its opinion, the Court proceeds on the premise that Oklahoma possesses "inherent" sovereign power to prosecute crimes on tribal reservations until and unless Congress "preempt[s]" that authority.  *Ante*, at 5–18.  The Court emphasizes that States normally wield broad police powers within their borders absent some preemptive federal law.  See *ante*, at 4–6; see also *Virginia Uranium, Inc.* v. *Warren*, 587 U. S. ___, ___ (2019) (lead opinion) (slip op., at 12).

But the effort to wedge Tribes into that paradigm is a category error.  Tribes are not private organizations within

state boundaries. Their reservations are not glorified private campgrounds. Tribes are sovereigns. And the preemption rule applicable to them is exactly the opposite of the normal rule. Tribal sovereignty means that the criminal laws of the States "can have no force" on tribal members within tribal bounds unless and until Congress clearly ordains otherwise. *Worcester*, 6 Pet., at 561. After all, the power to punish crimes by or against one's own citizens within one's own territory to the exclusion of other authorities is and has always been among the most essential attributes of sovereignty. See, *e.g.*, *Wilson* v. *Girard*, 354 U. S. 524, 529 (1957) (*per curiam*) ("A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders"); see also *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 136 (1812); E. de Vattel, Law of Nations 81–82 (1835 ed.).

Nor is this "'notion,'" *ante*, at 5, some discarded artifact of a bygone era. To be sure, Washington, Jefferson, Marshall, and so many others at the Nation's founding appreciated the sovereign status of Native American Tribes. See Part I–A, *supra*. But this Court's own cases have consistently reaffirmed the point. Just weeks ago, the Court held that federal prosecutors did not violate the Double Jeopardy Clause based on the essential premise that tribal criminal law is the product of a "separate sovereig[n]" exercising its own "retained sovereignty." *Denezpi* v. *United States*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 6) (internal quotation marks omitted). Recently, too, this Court confirmed that Tribes enjoy sovereign immunity from suit. See *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 788–789 (2014). Throughout our history, "the basic policy of *Worcester*" that Tribes are separate sovereigns "has remained." *Williams* v. *Lee*, 358 U. S., at 219.[2]

—————————

[2] See also *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip

Because Tribes are sovereigns, this Court has consistently recognized that the usual "standards of pre-emption" are "unhelpful." *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 143 (1980); see also *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 176 (1989); *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U. S. 463, 475–476 (1976); *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 170–172 (1973). In typical preemption cases, courts "start with the assumption" that Congress has not displaced state authority. *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). But when a State tries to regulate tribal affairs, the same "backdrop" does not apply because Tribes have a "claim to sovereignty [that] long predates that of our own Government." *McClanahan*, 411 U. S., at 172; see also *Bracker*, 448 U. S., at 143. So instead of searching for an Act of Congress *displacing* state authority, our cases require a search for federal legislation *conferring* state authority: "[U]nless and until Congress acts, the tribes retain their historic sovereign authority." *Bay Mills Indian Community*, 572 U. S., at 788 (internal quotation marks omitted); see *United States* v. *Cooley*, 593 U. S. ___, ___–___ (2021) (slip op., at 3–4) (instructing courts to ask if a "treaty or statute has explicitly divested Indian tribes of the . . . authority at issue"); Anderson 317. What is more, courts must "tread lightly" before concluding Congress has abrogated tribal sovereignty in favor of state authority. *Santa Clara Pueblo*, 436 U. S., at 60. Any ambiguities in

---

op., at 1); *United States* v. *Cooley*, 593 U. S. ___, ___–___ (2021) (slip op., at 3–4); *Oklahoma Tax Comm'n* v. *Citizen Band Potawatomi Tribe of Okla.*, 498 U. S. 505, 509 (1991); *United States* v. *Wheeler*, 435 U. S. 313, 322–323 (1978); *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56 (1978); *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975); *Talton* v. *Mayes*, 163 U. S. 376, 383–384 (1896); *United States* v. *Kagama*, 118 U. S. 375, 381–382 (1886); *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831).

Congress's work must be resolved in favor of tribal sovereignty and against state power. See *ibid.*; see also *Cotton Petroleum*, 490 U. S., at 177. And, if anything, these rules bear special force in the criminal context, which lies at the heart of tribal sovereignty and in which Congress "has provided a nearly comprehensive set of statutes allocating criminal jurisdiction" among federal, tribal, and state authorities. Cohen 527.[3]

## B

From 1834 to 1968, Congress adopted a series of laws governing criminal jurisdiction on tribal lands. Those laws are many, detailed, and clear. Each operates against the backdrop understanding that Tribes are sovereign and that in our constitutional order only Congress may displace their authority. Nor does anything in Congress's work begin to confer on Oklahoma the authority it seeks.

### 1

Start with the GCA, first adopted by Congress in 1834

---

[3] In the *civil* context, Congress has not always provided comprehensive rules allocating jurisdiction. See Cohen 527. In light of that fact, this Court has, in "exception[al]" cases, *id.*, at 524, allowed certain state laws to apply on tribal lands without express congressional approval, see, *e.g.*, *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, 154–159 (1980). But even in the civil context this Court has proceeded against the backdrop of tribal sovereignty, followed the presumption against state authority, sought to abide its own repeated admonitions to tread cautiously, and generally refused to consider competing state interests. See, *e.g.*, *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 143–144 (1980); Cohen 520–525. So, for example, in *Confederated Tribes*, this Court allowed the application of a state civil law only on a showing that the State sought to regulate market activities with primarily off-reservation effects and "in which the Tribes ha[d no] significant interest." 447 U. S., at 152. Meanwhile, in *Bracker* this Court refused to permit a State to apply its civil tax laws on tribal lands even though Congress had not expressly prohibited the State from doing so. 448 U. S., at 143.

and most recently reenacted in 1948. The GCA provides:

"Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to Indian Country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively." 18 U. S. C. § 1152.

As recounted above, Congress adopted the GCA in the aftermath of *Worcester*'s holding that the federal government alone may regulate tribal affairs and States do not possess inherent authority to apply their criminal laws on tribal lands. Responding to that decision, Congress did not choose to exercise its authority to allow state jurisdiction on tribal lands. Far from it. Congress chose only to extend *federal* law to tribal lands—and even then only for certain crimes involving non-Indian settlers. Otherwise, Congress recognized, those settlers might be subject to *tribal* criminal jurisdiction alone. See Part I–B, *supra*. Several features of the law confirm this understanding. Take just three.

First, the GCA compares "Indian country" to "place[s] within the sole and exclusive jurisdiction of the United States." § 1152. The latter category refers to federal enclaves like national parks and military bases that the Constitution places under exclusive federal control. See Art. I, § 8, cl. 17; *United States* v. *Cowboy*, 694 F. 2d 1228, 1234 (CA10 1982); see also *Ex parte Crow Dog*, 109 U. S. 556, 567

(1883). And state laws generally do not apply in federal enclaves. See, *e.g.*, *Fort Leavenworth R. Co.* v. *Lowe*, 114 U. S. 525, 532–533 (1885). Rather than unambiguously endow States with any sort of prosecutorial authority on tribal lands, the GCA thus makes plain that tribal lands are to be treated like federal enclaves subject to federal, not state, control.

Second, the GCA provides that the "general laws of the United States as to the punishment of offenses" shall apply on tribal lands. § 1152. Again, nothing here purports to extend state criminal laws to tribal lands. Quite the contrary. It would hardly make sense to apply federal general criminal law—to address all crimes ranging from murder to jaywalking—if state general criminal law already did the job. Traditionally, this Court does not assume multiple "sets of [general] criminal laws" apply to those subject to federal protection. *Lewis* v. *United States*, 523 U. S. 155, 163 (1998). Instead, when Congress converts an area into a federal enclave, we usually presume later-enacted state law "does not apply." *Parker Drilling Management Services, Ltd.* v. *Newton*, 587 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 9).

Third, after applying the federal government's general criminal laws to tribal lands, the GCA carves out some exceptions. It provides that federal law "shall not extend" to crimes involving only Indians, crimes by Indians where the perpetrator "has been punished by the local law of the tribe," or where a treaty grants a Tribe exclusive jurisdiction. § 1152. These exceptions ensure that the federal government does not meddle in cases most likely to implicate tribal sovereignty. And it defies the imagination to think Congress would have taken such care to limit federal authority over these most sensitive cases while (somewhere, somehow) leaving States, so often the Tribes' "deadliest enemies," to enjoy free rein. *United States* v. *Kagama*, 118 U. S. 375, 384 (1886).

### 2

When Congress enacted the MCA in 1885, it proceeded once more against the "backdrop" rule that only tribal criminal law applies on tribal lands, that States enjoy no inherent authority to prosecute cases on tribal lands, and that only Congress may displace tribal power. Nor, once more, did Congress's new legislation purport to allow States to prosecute crimes on tribal lands. In response to concerns with how tribal authorities were handling major crimes committed by tribal members, in the MCA Congress took a step beyond the GCA and instructed that, in the future, the *federal* government would have "exclusive jurisdiction" to prosecute certain crimes by Indian defendants on tribal lands. 18 U. S. C. § 1153(a); see also Part I–B, *supra*. Here again, Congress's work hardly would have been necessary or made sense if States already possessed jurisdiction to try crimes by or against Indians on tribal reservations. Plainly, Congress's "purpose" in adopting the MCA was to answer the "objection" that major crimes by tribal members on tribal lands would otherwise be subject to prosecution by tribal authorities alone. See *Kagama*, 118 U. S., at 383–385.

### 3

Consider next the Treaty of New Echota and the Oklahoma Enabling Act. In 1835, the United States entered into a treaty with the Cherokee. In that treaty, the Nation promised that, within a new reservation in what was to become Oklahoma, the Tribe would enjoy the right to govern itself and remain forever free from "State sovereignties" and "the jurisdiction of any State." Treaty with the Cherokee, Preamble, 7 Stat. 478. This Court has instructed that tribal treaties must be interpreted as they "would naturally be understood by the Indians" at ratification. *Herrera* v. *Wyoming*, 587 U. S. ___, ___ (2019) (slip op., at 19) (internal

quotation marks omitted).  And having just lost their traditional homelands to Georgia, who can doubt that the Cherokee understood this promise as a guarantee that they would retain their sovereign authority over crimes by or against tribal members subject only to federal, not state, law?  That was certainly the contemporaneous understanding of the House Committee on Indian Affairs, which observed that "[t]he United States and the Indian tribes [would be] the sole parties" with power over new reservations in the West.  H. Rep. No. 474, at 18; see also Part I–B, *supra*.  This Court has long shared the same view.  "By treaties and statutes," the Court has said, "the right of the Cherokee [N]ation to exist as an autonomous body, subject always to the paramount authority of the United States, has been recognized." *Talton* v. *Mayes*, 163 U. S. 376, 379–380 (1896).[4]

——————

[4] In a fleeting aside, the Court suggests that the treaty was "supplanted" by the Oklahoma Enabling Act in 1906, which endowed the State with "inherent" authority to try crimes by or against tribal members on tribal lands. *Ante*, at 22–23.  But the Court cites no proof for its *ipse dixit*, nor could it.  As we shall see, Congress took pains to abide its treaty promises when it adopted the Oklahoma Enabling Act and has never revoked them.  Nor may this Court abrogate treaties or statutes by wishing them away in passing remarks.  In a Nation governed by the rule of law, not men (or willful judges), only Congress may withdraw this Nation's treaty promises or revise its written laws.  See *McGirt* v. *Oklahoma*, 591 U. S. ___, ___ (2020) (slip op., at 7).  Even on its own terms, too, the Court's discussion of the treaty turns out to be dicta.  In the end, the Court abandons any suggestion that, with its admission to the Union, the Cherokee's treaties somehow evaporated and Oklahoma gained an "inherent" right to prosecute crimes by or against tribal members on tribal lands.  Instead, the Court resorts to a case-specific "balancing test" that acknowledges state law may not apply on tribal lands even in the absence of a preemptive statute.  See Part III–A, *infra*.

In the course of its dicta on the treaty, the Court highlights still two other irrelevant facts—that the Cherokee engaged in treaties with the Confederacy during the Civil War and that "Congress abolished treatymaking with the Indian nations in 1871." *Ante*, at 21, n. 7, 22, n. 8

In 1906, Congress sought to deliver on its treaty promises when it adopted the Oklahoma Enabling Act. That law paved the way for the new State's admission to the Union. But in doing so, Congress took care to require Oklahoma to "agree and declare" that it would "forever disclaim all right and title in or to . . . all lands lying within [the State's] limits owned or held by any Indian, tribe, or nation." 34 Stat. 270. Instead of granting the State some new power to prosecute crimes by or against tribal members, Congress insisted that tribal lands "shall be and remain subject to the jurisdiction, disposal, and control of the United States." *Ibid.* Oklahoma complied with Congress's instructions by adopting both of these commitments verbatim in its Constitution. Art. I, § 3.

Underscoring the nature of this arrangement, the Enabling Act further provided that "nothing contained in the

_____

(internal quotation marks omitted). In truth, while some members of the Tribe did side with the Confederacy, others fought for the Union. See 1 Litton 222, 224, 239. Regardless, after the Civil War the federal government punished the entire Tribe by stripping some of its lands in the 1866 Treaty of Washington. See *id.*, at 245. But that pact did not terminate the government's other existing treaty promises. To the contrary, the new treaty expressly confirmed that "[a]ll provisions of treaties, heretofore ratified . . . and not inconsistent with the provisions of this treaty, are hereby reaffirmed." Treaty with the Cherokee, Art. XXXI, 14 Stat. 806. As for the 1871 statute the Court cites, it makes plain that "nothing herein contained shall be construed to invalidate or impair the obligation of any treaty heretofore lawfully made and ratified with any . . . Indian nation or tribe." 16 Stat. 566. Recognizing as much, this Court in 1896 expressly recognized that the Tribe's "guarantee of self-government" in the Treaty of New Echota remained in force. *Talton*, 163 U. S., at 380. In the years since, this Court and others have recognized the continuing vitality of various aspects of the treaty too. See, *e.g.*, *Choctaw Nation* v. *Oklahoma*, 397 U. S. 620, 628 (1970); *EEOC* v. *Cherokee Nation*, 871 F. 2d 937, 938 (CA10 1989). And in this very case, the federal government has confirmed that the Nation's treaties continue to "protect" the Tribe. See Tr. of Oral Arg. 121.

[Oklahoma] constitution shall be construed . . . to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make *if this Act had never been passed.*" 34 Stat. 267–268 (emphasis added). Prior to statehood, too, no one could have questioned Congress's exclusive authority to regulate tribal lands and affairs in the Oklahoma territory. See, *e.g.*, U. S. Const., Art. IV; *Kagama*, 118 U. S., at 380 (citing federal government's "exclusive sovereignty" over federal territories); *Simms* v. *Simms*, 175 U. S. 162, 168 (1899) ("In the Territories of the United States, Congress has the entire dominion and sovereignty, . . . Federal and state"); *Harjo* v. *Kleppe*, 420 F. Supp. 1110, 1121 (DC 1976) (federal courts had pre-statehood jurisdiction); Clinton 960–962. The Oklahoma Enabling Act and the commitments it demanded in the new Oklahoma Constitution sought to maintain this status quo.

Recognizing the point, this Court has explained that, "[i]n passing the enabling act for the admission of the State of Oklahoma . . . Congress was careful to preserve the authority of the Government of the United States over the Indians, their lands and property, *which it had prior to the passage of the act.*" *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 309 (1911) (emphasis added). This Court has explained, too, that the "grant of statehood" to Oklahoma did nothing to disturb "the long-settled rule" that the "guardianship of the United States" over Native American Tribes in Oklahoma "has not been abandoned." *United States* v. *Ramsey*, 271 U. S. 467, 469 (1926). Instead, this Court has acknowledged, the federal government's "authority in respect of crimes committed by or against Indians continued after the admission of the state as it was before." *Ibid*. In fact, the Court has long interpreted nearly identical language in the

Arizona Enabling Act—enacted close in time to its Oklahoma counterpart—as reinforcing the traditional rule "that the States lac[k] jurisdiction" on tribal lands over crimes by or against Native Americans. *McClanahan*, 411 U. S., at 175; see also *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685, 687, n. 3 (1965).[5]

### 4

The few occasions on which Congress has even arguably authorized the application of state criminal law on tribal reservations still do not come anywhere near granting Oklahoma the power it seeks. In the late 1800s, this Court in

---

[5] In places, the Court seems to suggest that the Oklahoma Enabling Act endowed the State with "inherent" jurisdiction to try any crime committed within its borders. See *ante*, at 22–23. But in the end the Court abandons any suggestion that with statehood Oklahoma gained an inherent right to try cases involving tribal members within tribal bounds. See Part III–A, *infra*. So, once more, the Court's discussion of the Oklahoma Enabling Act turns out to be dicta future litigants are free to correct. Much correction is warranted. Not only does the Court fail to quote, let alone offer any analysis of, the relevant statutory text. Its suggestion that the Oklahoma Enabling Act granted the State criminal jurisdiction over tribal lands would require us to suppose that Congress abrogated two treaties with the Cherokee without ever saying so—an interpretation that would grossly defy our Nation's promises and this Court's obligation to read congressional work as a harmonious whole. Reading the Oklahoma Enabling Act in line with the Court's ill-considered dicta would also defy this Court's longstanding precedents in *Tiger*, *Ramsey*, and *McClanahan*. Of course, the Court tries to invoke *McBratney* and *Draper* as contrary authority. But as we will see in a moment, both cases carefully reiterated the rule that statehood does not imply the right to try crimes on tribal lands by or against tribal members. The Court also cites *Organized Village of Kake* v. *Egan*, 369 U. S. 60 (1962). But that case involved Alaska's Anti-Fish-Trap Conservation Law, not the Oklahoma Enabling Act. Admittedly, *Egan* quotes comments from a 1954 legislative committee hearing about the Alaska Enabling Act in which a few participants also happened to express views on the meaning of the Oklahoma Enabling Act, passed almost 50 years earlier. See *id.*, at 71. But surely this Court cannot think a few stray post-enactment legislative comments, "unmoored from any statutory text," *ante*, at 11, control over the statutory terms or our more specific precedents.

*McBratney* and *Draper* held that federal statutes admitting certain States to the Union effectively meant those States could now prosecute crimes on tribal lands involving only non-Indians. Yet, as aggressive as these decisions were, they took care to safeguard the rule that a State's admission to the Union does not convey with it the power to punish "crimes committed by or against Indians." *McBratney*, 104 U. S., at 624; *Draper*, 164 U. S., at 247. Indeed, soon after Oklahoma became a State, this Court explained that the "grant of statehood" may have endowed Oklahoma with authority to try crimes "not committed by or against Indians," but with statehood did not come any authority to try "crimes by or against Indians" on tribal lands. *Ramsey*, 271 U. S., at 469; see also n. 5, *supra*; *Donnelly* v. *United States*, 228 U. S. 243, 271 (1913); *Williams* v. *Lee*, 358 U. S., at 220; Cohen 506–509. The decision whether and when this arrangement should "cease" "rest[ed] with Congress alone." *Ramsey*, 271 U. S., at 469.

The truth is, Congress has authorized the application of state criminal law on tribal lands for offenses committed by or against Native Americans only in very limited circumstances. The most notable examples can be found in Public Law 280 and related statutes. In 1940, Kansas successfully lobbied Congress for criminal jurisdiction in Indian country. Nearly identical laws for North Dakota, Iowa, and New York followed close behind. Then in 1953, Congress adopted Public Law 280 in which it authorized five States to exercise criminal jurisdiction on tribal lands and established procedures for additional States to assume similar authority. In 1968, Congress amended Public Law 280. Now, before a State like Oklahoma may try crimes by or against Native Americans arising on tribal lands, it must take action to amend any state law disclaiming that authority; then, the State must seek and obtain tribal consent to any extension of state jurisdiction. See Part I–B, *supra*; Clinton 958–962. Unless a State takes these steps, it does

"not hav[e] jurisdiction."  25 U. S. C. §§ 1321(a), 1323(b).[6]

### 5

The Court's suggestion that Oklahoma enjoys "inherent" authority to try crimes against Native Americans within the Cherokee Reservation makes a mockery of all of Congress's work from 1834 to 1968.  The GCA and MCA?  On the Court's account, Congress foolishly extended federal criminal law to tribal lands on a mistaken assumption that only tribal law would otherwise apply.  Unknown to anyone until today, state law applied all along.  The treaty, the Oklahoma Enabling Act, and the provision in Oklahoma's constitution that Congress insisted upon as a condition of statehood?  The Court effectively ignores them.  The Kansas Act and its sibling statutes?  On the Court's account, they were needless too.  Congress's instruction in Public Law 280 that States may not exercise jurisdiction over crimes by or against tribal members on tribal lands until they amend contrary state law and obtain tribal consent?  Once more, it seems the Court thinks Congress was hopelessly misguided.

Through it all, the Court makes no effort to grapple with the backdrop rule of tribal sovereignty.  The Court proceeds oblivious to the rule that only a clear act of Congress may impose constraints on tribal sovereignty.  The Court ignores the fact that Congress has never come close to subjecting the Cherokee to state criminal jurisdiction over crimes against tribal members within the Tribe's reservation.  The Court even disregards our precedents recognizing that the

---

[6] The Court observes that Public Law 280 and related statutes did more than just grant States jurisdiction over crimes by non-Indians against Indians on tribal lands—"the issue here."  *Ante*, at 17.  Congress also granted "States . . . jurisdiction over crimes committed *by Indians*."  *Ibid.* (emphasis in original).  But that observation fails to answer the fact that, under the Court's view, a major portion of all these laws is surplusage—and none of them was necessary if States really enjoyed "inherent" criminal jurisdiction on tribal lands from the start.

"grant of statehood" to Oklahoma did not endow the State with any power to try "crimes committed by or against Indians" on tribal lands but reserved that authority to the federal government and Tribes alone. *Ramsey*, 271 U. S., at 469; see also *Tiger*, 221 U. S., at 309. From start to finish, the Court defies our duty to interpret Congress's laws and our own prior work "harmoniously" as "part of an entire *corpus juris*." A. Scalia & B. Garner, Reading Law 252 (2012); see also *Goodyear Atomic Corp.* v. *Miller*, 486 U. S. 174, 184–185 (1988).

### C

Putting aside these astonishing errors, Congress's work and this Court's precedents yield three clear principles that firmly resolve this case. First, tribal sovereign authority excludes the operation of other sovereigns' criminal laws unless and until Congress ordains otherwise. Second, while Congress has extended a good deal of federal criminal law to tribal lands, in Oklahoma it has authorized the State to prosecute crimes by or against Native Americans within tribal boundaries only if it satisfies certain requirements. Under Public Law 280, the State must remove state-law barriers to jurisdiction and obtain tribal consent. Third, because Oklahoma has done neither of these things, it lacks the authority it seeks to try crimes against tribal members within a tribal reservation. Until today, all this settled law was well appreciated by this Court, the Executive Branch, and even Oklahoma.

Consider first our own precedents and those of other courts. In 1946 in *Williams* v. *United States*, this Court recognized that, while States "may have jurisdiction over offenses committed on th[e] reservation between persons who are not Indians, the laws and courts of the United States, rather than those of [the States], have jurisdiction over offenses committed there . . . by one who is not an Indian against one who is an Indian." 327 U. S. 711, 714 (footnote

omitted). In *Williams* v. *Lee*, issued in 1959, this Court was clear again: "[I]f the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive." 358 U. S., at 220. As early as 1926, this Court made the same point while speaking directly to Oklahoma. *Ramsey*, 271 U. S., at 469–470. It is a point our cases have continued to make in recent years.[7] It is a point a host of other courts—including state courts issuing decisions contrary to their own interests—have acknowledged too.[8]

The Executive Branch has likewise understood the States to lack authority to try crimes by or against Indians in Indian country absent congressional authorization. Not only did the Washington Administration recognize as much. See Part I–A, *supra*. The same view has persisted throughout the Nation's history. In 1940, the Acting Secretary of the Interior advised Congress that state criminal jurisdiction extends "only to situations where both the offender and the victim" are non-Indians. S. Rep. No. 1523, 76th Cong., 3d Sess., 2 (Vol. 2). A few decades later, the Solicitor General made a similar representation to this Court. See Brief for United States as *Amicus Curiae* in *Arizona* v. *Flint*, O. T.

―――――――

[7] See, *e.g.*, *United States* v. *Bryant*, 579 U. S. 140, 146 (2016); *Nevada* v. *Hicks*, 533 U. S. 353, 365 (2001); *Solem* v. *Bartlett*, 465 U. S. 463, 465, n. 2 (1984); *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 470–471 (1979); *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 170–171 (1973).

[8] See, *e.g.*, *State* v. *Cungtion*, 969 N. W. 2d 501, 504–505 (Iowa 2022); *State* v. *Sebastian*, 243 Conn. 115, 128, and n. 21, 701 A. 2d 13, 22, and n. 21 (1997); *State* v. *Larson*, 455 N. W. 2d 600, 600–601 (S. D. 1990); *State* v. *Flint*, 157 Ariz. 227, 228, 756 P. 2d 324, 324–325 (App. 1988); *State* v. *Greenwalt*, 204 Mont. 196, 204–205, 663 P. 2d 1178, 1182–1183 (1983); *State* v. *Warner*, 71 N. M. 418, 421–422, 379 P. 2d 66, 68–69 (1963); *State* v. *Kuntz*, 66 N. W. 2d 531, 532 (N. D. 1954); *State* v. *Jackson*, 218 Minn. 429, 430, 16 N. W. 2d 752, 754–755 (1944); see also *United States* v. *Langford*, 641 F. 3d 1195, 1199 (CA10 2011); *United States* v. *Bruce*, 394 F. 3d 1215, 1221 (CA9 2005).

1988, No. 88–603, p. 3 (*Flint Amicus* Brief). In *McGirt*, the federal government once more acknowledged that States cannot prosecute crimes by or against tribal members within still-extant tribal reservations. See Brief for United States as *Amicus Curiae* in *McGirt* v. *Oklahoma*, O. T. 2019, No. 18–9526, p. 38. In this case, the government has espoused the same view yet again. See Brief for United States as *Amicus Curiae* 4; see also Dept. of Justice, Criminal Resource Manual 685 (updated Jan. 22, 2020).[9]

In the past, even Oklahoma has more or less conceded the point. The last time Oklahoma was before us, it asked this Court to usurp congressional authority and disestablish the Creek Reservation because, otherwise, the State "would not have jurisdiction over" "crimes committed against Indians" within its boundaries. See Tr. of Oral Arg. in *McGirt* v. *Oklahoma*, No. 18–9526, O. T. 2019, p. 54; see also *McGirt*, 591 U. S., at \_\_\_–\_\_\_ (slip op., at 37–38). In 1991, Oklahoma's attorney general formally resolved that major "[c]rimes committed by or against Indians . . . are under the exclusive province of the United States," while Tribes retain exclusive jurisdiction over "minor crimes committed by Indians." *Haney*, 22 Okla. Opp. Atty. Gen. 71, 1991 WL 567868, *3. And Oklahoma's own courts have recently taken the same position even in the face of vehement opposition from the State's executive branch. See, *e.g.*, *Spears*, 485 P. 3d, at 875, 877.

---

[9] As sometimes happens when the government considers a legal question over centuries, differing views have occasionally popped up. In 1979, the Office of Legal Counsel opined—with little analysis—that States might be able to exercise concurrent criminal jurisdiction on tribal lands, though it conceded the question was "exceedingly difficult." 3 Op. OLC 111, 117, 120. This kind of surface-level, hedged analysis is hardly robust evidence. In any event, the Executive Branch reverted to its traditional position in short order. That makes the Court's repeated reliance on this isolated opinion—and its failure to acknowledge the mountain of contradictory evidence—especially bewildering. See *ante*, at 12–16.

D

Against all this evidence, what is the Court's reply?  It acknowledges that, at the Nation's founding, tribal sovereignty precluded States from prosecuting crimes on tribal lands by or against tribal members without congressional authorization.  See *ante*, at 5.  But the Court suggests this traditional "'notion'" flipped 180 degrees sometime in "the latter half of the 1800s."  *Ante*, at 5, 21.  Since then, the Court says, Oklahoma has enjoyed the "inherent" power to try at least crimes by non-Indians against tribal members on tribal reservations until and unless Congress preempts state authority.

But exactly when and how did this change happen?  The Court never explains.  Instead, the Court seeks to cast blame for its ruling on a grab bag of decisions issued by our predecessors.  But the failure of that effort is transparent.  Start with *McBratney*, which the Court describes as our "leading case in the criminal context."  *Ante*, at 6.  There, as we have seen, the Court said that States admitted to the Union may gain the right to prosecute cases involving only non-Indians on tribal lands, but they do *not* gain any inherent right to punish "crimes committed by or against Indians" on tribal lands.  *McBratney*, 104 U. S., at 624.  The Court's reliance on *Draper* fares no better, for that case issued a similar disclaimer.  See 164 U. S., at 247.  Tellingly, not even Oklahoma thinks *McBratney* and *Draper* compel a ruling in its favor.  See Brief for Petitioner 12.  And if anything, the Court's invocation of *Donnelly*, 228 U. S. 243, is more baffling still.  *Ante*, at 14, n. 3.  There, the Court once more reaffirmed the rule that "offenses committed by or against Indians" on tribal lands remain subject to federal, not state, jurisdiction.  *Donnelly*, 228 U. S., at 271; see also *Ramsey*, 271 U. S., at 469.

That leaves the Court to assemble a string of carefully curated snippets—a clause here, a sentence there—from six

decisions out of the galaxy of this Court's Indian law jurisprudence. *Ante*, at 5–6. But this collection of cases is no more at fault for the Court's decision than the last. *Organized Village of Kake* v. *Egan*—which the Court seems to think is some magic bullet, see *ante*, at 5, 14, n. 2, 21, 22–24—addressed the prosaic question whether Alaska could apply its fishing laws on lands owned by a native Alaska tribal corporation. 369 U. S. 60, 61–63 (1962); see also n. 5, *supra*. Subsequently, the Court cabined that case to circumstances "dealing with Indians who have left or never inhabited reservations set aside for their exclusive use or who do not possess the usual accoutrements of tribal self-government." *McClanahan*, 411 U. S., at 167–168. Meanwhile, *New York ex rel. Cutler* v. *Dibble* allowed New York to use civil proceedings to eject non-Indian trespassers on Indian lands. 21 How. 366, 369–371 (1859). In *Surplus Trading Co.* v. *Cook*, the crime at issue did not take place on tribal lands but on a "supply station of the United States" sold by Arkansas to the federal government. 281 U. S. 647, 649 (1930). In *New York ex rel. Ray* v. *Martin*, this Court merely reaffirmed *McBratney* and held that States could exercise jurisdiction over crimes involving only non-Indians. 326 U. S. 496, 499–500 (1946). Both *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation* and *Nevada* v. *Hicks* issued holdings about state civil jurisdiction, not criminal jurisdiction striking at the heart of tribal sovereignty. See 502 U. S. 251, 256–258, 270 (1992); 533 U. S. 353, 361, 363, 374 (2001).

In the end, the Court cannot fault our predecessors for today's decision. The blame belongs only with this Court here and now. Standing before us is a mountain of statutes and precedents making plain that Oklahoma possesses no authority to prosecute crimes against tribal members on tribal reservations until it amends its laws and wins tribal consent. This Court may choose to ignore Congress's statutes and the Nation's treaties, but it has no power to negate

them. The Court may choose to disregard our precedents, but it does not purport to overrule a single one. As a result, today's decision surely marks an embarrassing new entry into the anticanon of Indian law. But its mistakes need not—and should not—be repeated.

### III

Doubtless for some of these reasons, even the Court ultimately abandons its suggestion that Oklahoma is "*inherent[ly]*" free to prosecute crimes by non-Indians against tribal members on a tribal reservation absent a federal statute "preempt[ing]" its authority. *Ante*, at 15. In the end, the Court admits that tribal sovereignty *can* require the exclusion of state authority even absent a preemptive federal statute. *Ante*, at 18. But then, after correcting course, the Court veers off once more. To determine whether tribal sovereignty displaces state authority in a case involving a non-Indian defendant and an Indian victim on a reservation in Oklahoma, the Court resorts to a "*Bracker* balancing" test. *Ibid.* Applying that test, the Court concludes that Oklahoma's interests in this case outweigh those of the Cherokee. All this, too, is mistaken root and branch.

### A

Begin with the most fundamental problem. The Court invokes what it calls the "*Bracker* balancing" test with no more appreciation of that decision's history and context than it displays in its initial suggestion that the usual rules of preemption apply to Tribes. The Court tells us nothing about *Bracker* itself, its reasoning, or its limits. Perhaps understandably so, for *Bracker* never purported to claim for this Court the raw power to "balance" away tribal sovereignty in favor of state criminal jurisdiction over crimes by or against tribal members—let alone ordain a wholly different set of jurisdictional rules than Congress

already has.

*Bracker* involved a relatively minor civil dispute. Arizona sought to tax vehicles used by the White Mountain Apache Tribe in logging operations on tribal lands. See *Bracker*, 448 U. S., at 138–140. The Tribe opposed the effort, pointing to a federal law that regulated tribal logging but did not say anything about preempting the State's vehicle tax. See *id.*, at 141, 145. The Court began by recognizing that the usual rules of preemption are not "properly applied" to Tribes. *Id.*, at 143. Instead, the Court started with the traditional "'backdrop'" presumption that States lack jurisdiction in Indian country. *Ibid*. And the Court explained that any ambiguities about the scope of federal law must be "construed generously" in favor of the Tribes as sovereigns. *Id.*, at 143–144. With these rules in mind, the Court proceeded to turn back the State's tax based on a "particularized inquiry into the nature of the state, federal, and tribal interests at stake." *Id.*, at 145. The Court judged that "traditional notions of [tribal] sovereignty," the federal government's "policy of promoting tribal self-sufficiency," and the rule requiring it to resolve "[a]mbiguities" in favor of the Tribe trumped any competing state interest. *Id.*, at 143–144, 151.

Nothing in any of this gets the Court close to where it wishes to go. If Arizona had to proceed against the traditional "backdrop" rule excluding state jurisdiction, Oklahoma must. And if Arizona could not overcome that backdrop rule because it could not point to clear federal statutory language authorizing its comparatively minor civil tax, it is unfathomable how Oklahoma might overcome that rule here. The State has pointed—and can point—to nothing in Congress's work granting it the power to try crimes against tribal members on a tribal reservation. In *Bracker*, the Court found it instructive that Congress had "comprehensive[ly]" regulated "the harvesting of Indian timber," even if it had not spoken directly to the question of

vehicle taxes. *Id.*, at 145–146, 148. Here, Congress has not only pervasively regulated criminal jurisdiction in Indian country, it has spoken to the very situation we face: States like Oklahoma may exercise jurisdiction over crimes within tribal boundaries by or against tribal members only with tribal consent.

The simple truth is *Bracker* supplies zero authority for this Court's course today. If Congress has not always "been specific about the allocation of civil jurisdiction in Indian country," the same can hardly be said about the allocation of criminal authority. Cohen 527. Congress "has provided a nearly comprehensive set of statutes allocating criminal jurisdiction." *Ibid.* In doing so, Congress has *already* "balanced" competing tribal, state, and federal interests— and its balance demands tribal consent. Exactly nothing in *Bracker* permits us to ignore Congress's directive.

### B

Plainly, the Court's balancing-test game is not one we should be playing in this case. But what if we did? Suppose this Court could (somehow) ignore Congress's decision to allow States like Oklahoma to exercise criminal jurisdiction in cases like ours only with tribal consent. Suppose we could (somehow) replace that rule with one of our own creation. Even proceeding on that stunning premise, it is far from obvious how the Court arrives at its preferred result.

In reweighing competing state and tribal interests for itself, the Court stresses two points. First, the Court suggests that its balance is designed to "help" Native Americans. *Ante*, at 20 (suggesting that Indians would be "second-class citizens" without this Court's intervention); Tr. of Oral Arg. 66 (suggesting state jurisdiction is designed to "help" tribal members). Second, the Court says state jurisdiction is needed on the Cherokee Reservation today because "in the wake of *McGirt*" some defendants "have

simply gone free." *Ante*, at 3–4. On both counts, however, the Court conspicuously loads the dice.

1

Start with the assertion that allowing state prosecutions in cases like ours will "help" Indians. The old paternalist overtones are hard to ignore. Yes, under the laws Congress has ordained Oklahoma may acquire jurisdiction over crimes by or against tribal members only with tribal consent. But to date, the Cherokee have misguidedly shown no interest in state jursidiction. Thanks to their misjudgment, they have rendered themselves "second-class citizens." *Ante*, at 20. So, the argument goes, five unelected judges in Washington must now make the "right" choice for the Tribe. To state the Court's staggering argument should be enough to refute it.

Nor does the Court even pause to consider some of the reasons why the Cherokee might not be so eager to invite state prosecutions in cases like ours. Maybe the Cherokee have so far withheld their consent because, throughout the Nation's history, state governments have sometimes proven less than reliable sources of justice for Indian victims. As early as 1795, George Washington observed that "a Jury on the frontiers" considering a crime by a non-Indian against an Indian could "hardly be got to listen to a charge, much less to convict a culprit." Letter to E. Pendleton (Jan. 22), in 17 Papers of George Washington: Presidential Series 424, 426 (D. Hoth & C. Ebel eds. 2013). Undoubtedly, too, Georgia once proved among the Cherokee's "deadliest enemies." *Kagama*, 118 U. S., at 384.

Maybe the Cherokee also have in mind experiences particular to Oklahoma. Following statehood, settlers embarked on elaborate schemes to deprive Indians of their lands, rents, and mineral rights. "Many young allottees were virtually kidnaped just before they reached their majority"; some were "induced to sign deeds at midnight on

the morning they became of age." Debo 197–198. Others were subjected to predatory guardianships; state judges even "reward[ed] their supporters [with] guardianship appointments." *Id.*, at 183. Oklahoma's courts also sometimes sanctioned the "legalized robbery" of these Native American children "through the probate courts." *Id.*, at 182. Even almost a century on, the federal government warned of "the possibility of prejudice [against Native Americans] in state courts." *Flint Amicus* Brief 5.

Whatever may have happened in the past, it seems the Court can imagine only a bright new day ahead. Moving forward, the Court cheerily promises, more prosecuting authorities can only "help." Three sets of prosecutors—federal, tribal, and state—are sure to prove better than two. But again it's not hard to imagine reasons why the Cherokee might see things differently. If more sets of prosecutors are always better, why not allow Texas to enforce its laws in California? Few sovereigns or their citizens would see that as an improvement. Yet it seems the Court cannot grasp why the Tribe may not.

The Court also neglects to consider actual experience with concurrent state jurisdiction on tribal lands. According to a group of former United States Attorneys, in practice concurrent jurisdiction has sometimes "create[d] a pass-the-buck dynamic . . . with the end result being fewer police and more crime." Brief for Former United States Attorneys et al. as *Amici Curiae* 13; see also C. Goldberg, Public Law 280: The Limits of State Jurisdiction Over Reservation Indians, 22 UCLA L. Rev. 535, 552, and n. 92 (1975); Goldberg-Ambrose 1423. Federal authorities may reduce their involvement when state authorities are present. In turn, some States may not wish to devote the resources required and may view the responsibility as an unfunded federal mandate. Thanks to realities like these, "[a]lmost as soon as Congress began granting States [criminal] jurisdiction" through Public Law 280, "affected

Tribal Nations began seeking retrocession and repeal." Brief for National Indigenous Women's Resource Center et al. as *Amici Curiae* 12. Recently, a bipartisan congressional commission agreed that more state criminal jurisdiction in Indian country is often not a good policy choice. See Indian Law and Order Commission, A Roadmap for Making Native America Safer: Report to the President and Congress of the United States xi, xiv, 11–15 (Nov. 2013). Still, none of this finds its way into the Court's cost-benefit analysis.

2

Instead, the Court marches on. The second "factor" it weighs in its "balance"—and the only history it seems interested in consulting—concerns Oklahoma's account of its experiences in the last two years since *McGirt*. Adopting the State's representations wholesale, the Court says that decision has posed Oklahoma with law-and-order "challenge[s]." *Ante*, at 4. To support its thesis, the Court cites the State's unsubstantiated "estimat[e]" that *McGirt* has forced it to "transfer prosecutorial responsibility for more than 18,000 cases per year to" federal and tribal authorities. *Ibid.* Apparently on the belief that the transfer of cases from state to federal prosecutors equates to an eruption of chaos and criminality, the Court remarks casually that traditional limitations on state prosecutorial authority on tribal lands were "insignificant in the real world" before *McGirt*. *Ante*, at 16.

But what does this prove? Put aside for the moment questions about the accuracy of Oklahoma's statistics and what the number of cases transferred from state to federal prosecutors may or may not mean for law and order. See Tr. of Oral Arg. 26 (questioning whether the State's "figures" might be "grossly exaggerated"). Taking the Court's account at face value, it might amount to a reason for Oklahoma to lobby the Cherokee to consent to state jurisdiction. It might be a reason for the State to petition

Congress to revise criminal jurisdictional arrangements in the State even without tribal consent. But it is no act of statutory or constitutional interpretation. It is a policy argument through and through.

Nor is the Court's policy argument exactly complete in its assessment of the costs and benefits. When this Court issued *McGirt*, it expressly acknowledged that cases involving crimes by or against tribal members within reservation boundaries would have to be transferred from state to tribal or federal authorities. 591 U. S., at ___–___ (slip op., at 36–42). This Court anticipated, too, that this process would require a period of readjustment. But, the Court recognized, all this was necessary only because Oklahoma had long overreached its authority on tribal reservations and defied legally binding congressional promises. See *ibid.*

Notably, too, neither the tribal nor the federal authorities on the receiving end of this new workload think the "costs" of this period of readjustment begin to justify the Court's course. For their part, Tribes in Oklahoma have hired more police officers, prosecutors, and judges. See Cherokee Brief 10–11. Based on that investment, Oklahoma's Tribes have begun to prosecute substantially more cases than they once did. See *id.*, at 12–13. And they have also shown a willingness to work with Oklahoma, having signed hundreds of cross-deputization agreements allowing local law enforcement to collaborate with tribal police. *Id.*, at 15–16, and n. 39. Even Oklahoma's *amici* concede these agreements have proved "an important tool" for law enforcement. Brief for Oklahoma District Attorneys Association et al. as *Amici Curiae* 14.

Both of the federal government's elected branches have also responded, if not in the way this Court happens to prefer. Instead of forcing state criminal jurisdiction onto Tribes, Congress has chosen to allocate additional funds for law enforcement in Oklahoma. See, *e.g.,* Consolidated

Appropriations Act, H. R. 2471, 117th Cong., 2d Sess., 78 (2022). Meanwhile, the Solicitor General has offered the Executive Branch's judgment that *McGirt*'s "practical consequences" do not justify this Court's intervention, explaining that the Department of Justice is "working diligently with tribal and State partners" in Oklahoma. See Brief for United States as *Amicus Curiae* 32.

There is even more evidence cutting against the Court's dystopian tale. According to a recent United States Attorney in Oklahoma, "the sky isn't falling" and "partnerships between tribal law enforcement and state law enforcement" are strong. A. Herrera, Trent Shores Reflects on His Time as U. S. Attorney, Remains Committed to Justice for Indian Country, KOSU-NPR (Feb. 24, 2021), www.kosu.org/politics/2021-02-24/trent-shores-reflects-on-his-time-as-u-s-attorney-remains-committed-to-justice-for-indian-country. A Federal Bureau of Investigation special agent in charge of Oklahoma has stated that violent crimes "'are being pursued as heavily as they were in the past, and in some cases, maybe even stronger.'" A. Brothers, Oklahoma Special Agent Says FBI Faces Challenges in 3 Categories, News on 6 (Feb. 14, 2022), https://www.newson6.com/story/620b261bf8cd4a07e5cb845b/oklahoma-special-agent-says-fbi-faces-challenges-in-3-categories. And the Tribes—those most affected by all this supposed lawlessness within their reservations—tell us that, after a period of adjustment, federal prosecutors are now pursuing lower level offenses vigorously too. See Brief for Muscogee (Creek) Nation as *Amicus Curiae* on Pet. for Cert. 11–12, and nn. 21–22 (collecting indictments). The federal government has made a similar representation to this Court. Tr. of Oral Arg. 118. Nor is it any secret that those convicted of federal crimes generally receive longer sentences than individuals convicted of similar state offenses. See, *e.g.*, Bureau of Justice Statistics, Felony Sentences in State Courts, 2006—Statistical Tables 9

(2009) (Table 1.6).

In recounting all this, I do not profess certainty about the optimal law enforcement arrangements in Oklahoma. I do not pretend to know all the relevant facts, let alone how to balance each of them in this complex picture. Nor do I claim to know what weight to give historical wrongs or future hopes. I offer the preceding observations only to illustrate the one thing I am sure of: This Court has no business usurping congressional decisions about the appropriate balance between federal, tribal, and state interests. If the Court's ruling today sounds like a legislative committee report touting the benefits of some newly proposed bill, that's because it is exactly that. And given that a nine-member court is a poor substitute for the people's elected representatives, it is no surprise that the Court's cost-benefit analysis is radically incomplete. The Court's decision is not a judicial interpretation of the law's meaning; it is the pastiche of a legislative process.

C

As unsound as the Court's decision is, it would be a mistake to overlook its limits. In the end, the Court admits that tribal sovereignty *can* displace state authority even without a preemptive statute. See Part III–A, *supra.* To be sure, the Court proceeds to disparage a federal statute requiring Oklahoma to obtain tribal consent before trying any crime involving an Indian victim within the Cherokee Reservation. But look at what the Court leaves unresolved. The Court does not pass on Public Law 280's provision that States "shall not" be entitled to assume jurisdiction on tribal lands until they "appropriately amen[d]" state laws disclaiming authority over tribal reservations. 25 U. S. C. § 1324. The Court gestures toward the Cherokee's treaties and the Oklahoma Enabling Act, but ultimately abandons any argument that those treaties were lawfully abrogated or that the Oklahoma Enabling Act endowed Oklahoma

with inherent authority to try cases involving Native Americans within tribal bounds. See *ante*, at 18. Nor does the Court address the relevant text of those treaties or the Enabling Act—let alone come to terms with our precedents holding that Oklahoma's "grant of statehood" did not include the power to try "crimes committed by or against Indians" on tribal lands. *Ramsey*, 271 U. S., at 469; see also *Tiger*, 221 U. S., at 309. Nothing in today's decision could or does begin to preclude the Cherokee or other Tribes from pressing arguments along any of these lines in future cases. The unamended Oklahoma Constitution and other state statutes and judicial decisions may stand as independent barriers to the assumption of state jurisdiction as a matter of state law too.

The Court's decision is limited in still other important ways. Most significantly, the Court leaves undisturbed the ancient rule that States cannot prosecute crimes by Native Americans on tribal lands without clear congressional authorization—for that would touch the heart of "tribal self-government." *Ante*, at 17. At least that rule (and maybe others) can never be balanced away. Indeed, the Court's ruling today rests in significant part on the fact that Tribes currently lack criminal jurisdiction over non-Indians who commit crimes on tribal lands—a factor that obviously does not apply to cases involving Native American defendants. *Ante*, at 19.

Additionally, nothing in the "*Bracker* balancing" test the Court employs foreordains today's grim result for different Tribes in different States. *Bracker* instructs courts to focus on the "specific context" at issue, taking cognizance of the particular circumstances of the Tribe in question, including all relevant treaties and statutes. 448 U. S., at 145. Nor are Tribes and their treaties "fungible." S. Prakash, Against Tribal Fungibility, 89 Cornell L. Rev. 1069, 1071–1072 (2004). There are nearly 600 federally recognized Indian Tribes across the country. See Anderson 3. Some of

their treaties appear to promise tribal freedom from state criminal jurisdiction in express terms. See, *e.g.*, Treaty with the Navajo, Art. I, June 1868, 15 Stat. 667 (guaranteeing that those who commit crimes against tribal members will be "arrested and punished according to the laws of the United States"). Any analysis true to *Bracker* must take cognizance of all of this. Any such analysis must recognize, too, that the standards of preemption applicable "in other areas of the law" are "unhelpful" when it comes to Tribes. *Bracker*, 448 U. S., at 143. Instead, courts must proceed against the "'backdrop'" of tribal sovereignty, *ibid.*, with an "assumption that the States have no power to regulate the affairs of Indians on a reservation" or other tribal lands, *Williams*, 358 U. S., at 219–220. To overcome that backdrop assumption, a clear congressional statement is required and any ambiguities must be "construed generously" in favor of the Tribes. *Bracker*, 448 U. S., at 143–144; see also *Cotton Petroleum*, 490 U. S., at 177–178.

The Court today may ignore a clear jurisdictional rule prescribed by statute and choose to apply its own balancing test instead. The Court may misapply that balancing test in an effort to address one State's professed "law and order" concerns. In the process, the Court may even risk unsettling longstanding and clear jurisdictional rules nationwide. But in the end, any faithful application of *Bracker* to other Tribes in other States should only confirm the soundness of the traditional rule that state authorities may not try crimes like this one absent congressional authorization.[10]

---

[10] In a final drive-by flourish, the Court asserts that its "jurisdictional holding[s]" today apply "throughout the United States." For emphasis, the Court repeats the point in a footnote. *Ante*, at 24, n. 8, 25. But not only does the Court acknowledge that Congress may preempt state jurisdiction over crimes like this one. See *ante*, at 6. The truth is, in this case involving one Tribe in one State the Court does not purport to evaluate

Nor must Congress stand by as this Court sows needless confusion across the country. Even the Court acknowledges that Congress can undo its decision and preempt state authority at any time. *Ante*, at 6. And Congress could do exactly that with a simple amendment to Public Law 280. It might say: A State lacks criminal jurisdiction over crimes by or against Indians in Indian Country, unless the State complies with the procedures to obtain tribal consent outlined in 25 U. S. C. § 1321, and, where necessary, amends its constitution or statutes pursuant to 25 U. S. C. § 1324. Of course, that reminder of the obvious should hardly be necessary. But thanks to this Court's egregious misappropriation of legislative authority, "the ball is back in Congress' court." *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618, 661 (2007) (Ginsburg, J., dissenting).

\*

In the 1830s, this Court struggled to keep our Nation's promises to the Cherokee. Justice Story celebrated the

---

the (many) treaties, federal statutes, precedents, and state laws that may preclude state jurisdiction on specific tribal lands around the country. Nor are we legislators entitled to pass new laws of general applicability, but a court charged with resolving cases and controversies involving particular parties who are entitled to make their own arguments in their own cases. The very precedent the Court invokes as authority to reach its decision today recognizes as much—and demands future courts conduct any analysis sensitive to the "specific context" of each Tribe, its treaties, and relevant laws. *Bracker*, 448 U. S., at 145. For that matter, even when it comes to the Cherokee the Court leaves much unanswered. The Court does not confront the relevant text of the Cherokee's treaties, the Oklahoma Enabling Act, or the relevant portions of our precedents interpreting both. And the Court does not mention the terms of Public Law 280 that require Oklahoma to amend its laws before asserting jurisdiction. Even more than all that, the Court ultimately retreats from its claim that statehood confers an "inherent" right to prosecute crimes by non-Indians against tribal members on tribal lands. It rests instead on a "balancing test" that makes anything it does say about the "inherent" right of States to try cases within Indian country dicta through and through.

decision in *Worcester*: "'[T]hanks be to God, the Court can wash [its] hands clean of the iniquity of oppressing the Indians and disregarding their rights.'" Breyer 420. "'The Court had done its duty,'" even if Georgia refused to do its own. *Ibid.* Today, the tables turn. Oklahoma's courts exercised the fortitude to stand athwart their own State's lawless disregard of the Cherokee's sovereignty. Now, at the bidding of Oklahoma's executive branch, this Court unravels those lower-court decisions, defies Congress's statutes requiring tribal consent, offers its own consent in place of the Tribe's, and allows Oklahoma to intrude on a feature of tribal sovereignty recognized since the founding. One can only hope the political branches and future courts will do their duty to honor this Nation's promises even as we have failed today to do our own.